## STATE OF CONNECTICUT *v.* BENJAMIN J. PERKINS
## (SC 17099)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued March 9—officially released September 28, 2004

*David T. Grudberg*, with whom was *Ira B. Grudberg*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Richard Colangelo, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The so-called "waiver rule" provides that, "when a motion for [a judgment of] acquittal at the close of the state's case is denied, a defendant may not secure appellate review of the trial court's ruling without [forgoing] the right to put on evidence in his or her own behalf. The defendant's sole remedy is to remain silent and, if convicted, to seek reversal of the conviction because of insufficiency of the state's evidence. If the defendant elects to introduce evidence, the appellate review encompasses the evidence in toto."

*State* v. *Rutan*, 194 Conn. 438, 440, 479 A.2d 1209 (1984). The defendant appeals[1] from the trial court's judgment of conviction, rendered after a jury trial, of manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b (a),[2] misconduct with a motor vehicle in violation of General Statutes § 53a-57 (a),[3] and evasion of responsibility in the operation of a motor vehicle in violation of General Statutes § 14-224 (a).[4] The defendant claims, among other things,[5] that the waiver rule is unconstitu-

[1] The defendant appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 53a-56b (a) provides: "A person is guilty of manslaughter in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he causes the death of another person as a consequence of the effect of such liquor or drug."

[3] General Statutes § 53a-57 (a) provides: "A person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person."

[4] General Statutes § 14-224 (a) provides: "Each person operating a motor vehicle who is knowingly involved in an accident which causes serious physical injury, as defined in section 53a-3, to or results in the death of any other person shall at once stop and render such assistance as may be needed and shall give his name, address and operator's license number and registration number to the person injured or to any officer or witness to the death or serious physical injury of any person, and if such operator of the motor vehicle causing the death or serious physical injury of any person is unable to give his name, address and operator's license number and registration number to the person injured or to any witness or officer, for any reason or cause, such operator shall immediately report such death or serious physical injury of any person to a police officer, a constable, a state police officer or an inspector of motor vehicles or at the nearest police precinct or station, and shall state in such report the location and circumstances of the accident causing the death or serious physical injury of any person and his name, address, operator's license number and registration number."

[5] The defendant also claims: (1) that the trial court improperly excluded certain evidence relating to his conduct and state of mind immediately after the accident; (2) that the trial court improperly refused to strike the testimony of one of the state's expert witnesses; and (3) that his conviction should be reversed because the state engaged in prosecutorial misconduct. We disagree with each of these claims.

tional, and, to this end, he argues that the trial court improperly denied his motion for a judgment of acquittal at the close of the state's case with respect to the charges of manslaughter in the second degree with a motor vehicle and misconduct with a motor vehicle. We disagree with the defendant's claim that the waiver rule is unconstitutional and, on the basis of all of the evidence presented to the jury, we affirm the judgment of the trial court.

The defendant, Benjamin J. Perkins, was charged with manslaughter in the second degree with a motor vehicle in violation of § 53a-56b (a), misconduct with a motor vehicle in violation of § 53a-57 (a), and evasion of responsibility in the operation of a motor vehicle in violation of § 14-224 (a). At the close of the state's case, the trial court denied the defendant's motion for a judgment of acquittal. At the close of the defendant's case, the defendant again moved for a judgment of acquittal, and the trial court reserved decision on that motion. The jury found the defendant guilty of all charges, and the trial court rendered judgment of conviction in accordance with the jury's verdict. Thereafter, the trial court denied the defendant's motions for a judgment of acquittal and for a new trial.[6] This appeal followed.

The jury reasonably could have found the following facts on the basis of the evidence presented during the state's case-in-chief. On the evening of November 20, 2000, the defendant was at La Cucina restaurant in Fairfield with the victim, Michael Novack, and other friends, including Jason Medvegy. The defendant arrived at La Cucina that evening at approximately 9

---

[6] The trial court sentenced the defendant as follows: on the manslaughter charge, ten years imprisonment suspended after six years; on the misconduct charge, five years imprisonment suspended after four years; and on the evasion charge, three years imprisonment. These sentences were to run concurrently, for a total effective sentence of ten years imprisonment suspended after six years, with five years probation.

p.m. Medvegy arrived shortly thereafter, and, after greetings were exchanged, he noticed that the defendant was drinking scotch. The defendant, the victim and Medvegy remained inside La Cucina until approximately 10:30 or 10:45 p.m., and then they conversed in the parking lot of the restaurant for approximately fifteen minutes. At approximately 11 p.m., the defendant and the victim departed in the defendant's automobile, with the defendant driving and the victim seated in the front passenger seat.

Sometime between 11:45 and 11:50 p.m., the defendant's automobile was traveling at fifty-five miles per hour along Wilton Road in Westport. The vehicle then skidded off the road, which was damp that evening, went through some fencing, and eventually crashed into a tree.[7] The portion of road where the crash occurred, which is curvy and has several changes in elevation, had a posted speed limit of twenty-five miles per hour.

Emergency personnel arrived at the accident scene shortly thereafter, and discovered the victim, who was already dead, in the front passenger seat of the vehicle. The cause of death was blunt force cerebral trauma,[8] which was consistent with injuries that could have resulted from an automobile striking a stationary object, such as a tree.

The driver of the vehicle, however, could not be located. Using a thermal imaging camera, which detects human heat sources, firefighters scanned a one-half mile area around the accident scene and were unable

---

[7] The speed of the vehicle at various points in its progression off the road was as follows: (1) when it first began to skid, forty-seven miles per hour; (2) while it was skidding on the grass and dirt, twenty-four miles per hour; and (3) just before striking the tree, fourteen miles per hour.

[8] The victim had suffered severe external injuries to his head and face, including a large laceration across his forehead, as well as other facial lacerations. The victim also had suffered internal injuries to his brain and skull.

to locate anyone else who may have been involved in the crash. In addition, it was clear to emergency personnel that, on the basis of the accident configuration, the victim had not been the driver of the vehicle.

Shortly after 12 a.m. on November 21, 2000, the defendant, using his cellular telephone, called his supervisor, Steven Habetz, who was home in bed. After getting dressed, Habetz proceeded in his car toward Wilton Road in Westport, whereupon he discovered that a portion of the road had been blocked off, and he was able to see flashing lights in the distance. According to telephone records, Habetz also received telephone calls from the defendant at 12:13, 12:25, 12:29 and 12:30 a.m. On the basis of the defendant's directions, Habetz picked up the defendant on the street at approximately 12:30 a.m. The defendant, who appeared disheveled and dirty, was bleeding from his head, was limping, and looked like he had been in a brawl. After concluding that the defendant needed an attorney, Habetz drove the defendant back to Habetz' home.

The police determined that the defendant was the owner of the wrecked automobile. On the morning following the accident, November 21, 2000, after trying unsuccessfully to locate the defendant at the accident scene and at his place of employment, Sergeant Anthony Guinta of the Westport police department contacted Habetz. Habetz indicated that he had received a telephone call from the defendant the night before, but did not disclose his whereabouts to Guinta. Approximately one hour later, the defendant's attorney, Philip Russell, contacted Guinta. Later that day, one of Russell's associates brought to the police the clothing worn by the defendant on the evening of the accident.

The police later determined that the defendant had been treated for injuries at Greenwich Hospital on November 21, 2000, the day after the accident. In addi-

tion, human brain tissue, which matched that of the victim, was discovered on the jacket worn by the defendant on the evening of the accident.

At trial, the state presented the testimony of five witnesses that arguably was relevant to the issue of the defendant's intoxication. Francis X. Grosner testified that, on the evening of the accident, he was working as a bartender at the Tavern on the Main restaurant in downtown Westport. He testified that he had began work at about 4:30 p.m. that evening, and he recalled serving beer to two men. Grosner could not identify the defendant as one of the men he had served that evening.

Medvegy testified that, when he arrived at La Cucina, the defendant "had a scotch in front of him." When asked if the defendant "was drinking scotch that night," Medvegy responded, "Yes." Finally, although Medvegy did not know how many drinks the defendant had consumed that evening, he stated that the defendant did not appear to be intoxicated.

Ralph Fidaleo was working as a bartender at La Cucina on the evening of the accident. When asked if he "recall[ed] serving a G.Q. looking guy," Fidaleo stated, "Yes, I do." Fidaleo also testified that he served that individual three glasses of scotch, that the individual "was drinking [th]em," and that ordinarily he pours two ounces of alcohol into each drink that he serves. In addition, Fidaleo testified that, if he saw the "G.Q. looking guy" again, he would not "be able to pick him out." Finally, when asked if the individual appeared to be intoxicated, Fidaleo replied, "Not at all."

In an effort to show that the defendant's conduct immediately after the accident warranted the inference that he had been intoxicated, the state presented the testimony of Habetz, who stated that he had received five telephone calls from the defendant shortly after midnight. Habetz also testified that, in his opinion, the

defendant needed an attorney. Finally, even though Habetz testified that the defendant had appeared to be injured, he drove the defendant back to Habetz' home rather than to the hospital.

Finally, the state presented the testimony of Joel Milzoff, a toxicologist employed by the toxicology and controlled substances section of the Connecticut department of public safety, as an expert witness in the field of toxicology. Milzoff testified that alcohol is a depressant, which inhibits reflexes, the ability to respond to situations, the ability to operate machinery, and the ability to perform complex tasks. In addition, Milzoff testified that a single dose of alcohol, i.e., twelve ounces of beer or one ounce of eighty proof scotch, affects an individual to a "slight degree," and that as alcohol consumption increases, so do the resulting effects from the alcohol.

At the close of the state's case, the defendant moved for a judgment of acquittal on all three charges arguing that the state's evidence was insufficient to support a verdict of guilty. The trial court denied the motion.

The defendant then presented several witnesses,[9] and also testified on his own behalf. The defendant testified that he had met the victim at Tavern on the Main shortly after 7 p.m., where he drank one beer.[10] Thereafter, the defendant and the victim arrived at La Cucina sometime before 9 p.m. to meet friends. The defendant testified that, although three glasses of scotch had been ordered for him at La Cucina, he drank two glasses, but, after having a sip from the third glass, he left it on the counter and exited the restaurant.

[9] In addition to witnesses who vouched for the defendant's good character, the several witnesses who had been with the defendant at La Cucina testified, all of whom indicated that he did not appear to be intoxicated.

[10] The defendant testified that, although he had ordered two beers, he consumed only one because the victim and he were late.

Thereafter, at approximately 11:30 p.m., the defendant and the victim left La Cucina in the defendant's car. The defendant testified that it had been raining, and that a deer came out from the right, and, in an effort to avoid the deer, he lost control of the vehicle. The next thing that the defendant recalled was waking up in his car and yelling the victim's name. The defendant also recalled being lost in the woods, calling 911, and then calling Habetz.

In addition, the defendant presented the expert testimony of Kenneth Selig, a forensic psychiatrist, who had examined the defendant approximately two weeks after the accident. Selig testified that the defendant had suffered a traumatic brain injury as a result of the accident, which may have contributed to memory loss. On cross-examination, Selig testified that the defendant had told him that he had consumed one and one-half beers and three glasses of scotch on the evening of the accident. Finally, Selig also testified that, upon a review of the defendant's hospital records, the defendant never mentioned to hospital personnel that he had been trying to avoid a deer immediately before the accident.

At the close of the defendant's case, the defendant moved for a judgment of acquittal with respect to the manslaughter with a motor vehicle charge and the evading responsibility charge. The trial court reserved decision on that motion, and the jury returned a verdict of guilty with respect to all the charges. The trial court rendered judgment of conviction in accordance with the jury's verdict. Additional facts and procedural history will be presented as necessary.

The defendant presents several claims on appeal. First, the defendant claims that there was insufficient evidence presented, either during the state's case-in-chief or during the entirety of the trial, to support the jury's verdict. Second, the defendant claims that the trial

court improperly excluded certain evidence relating to his conduct and state of mind immediately after the accident. Third, the defendant claims that the trial court improperly refused to strike the expert testimony of Milzoff. Finally, the defendant claims that his conviction should be reversed because the state engaged in prosecutorial misconduct. We reject these claims, and address each seriatim.

I

## SUFFICIENCY OF THE EVIDENCE AND THE WAIVER RULE

The defendant attacks the sufficiency of the evidence on two fronts. First, with respect to the charges of manslaughter in the second degree with a motor vehicle and misconduct with a motor vehicle, the defendant claims that the trial court improperly denied his motion for a judgment of acquittal at the close of the state's case because the state presented insufficient evidence as a matter of law. Recognizing that the waiver rule ordinarily precludes appellate review of such rulings, the defendant contends that the waiver rule is unconstitutional, or, in the alternative, the defendant asks this court to exercise its supervisory authority and not apply the waiver rule in the present case. Second, the defendant claims that, even if the waiver rule is applied, there was insufficient evidence presented during the entire trial to support the jury's verdict with respect to the charge of manslaughter in the second degree with a motor vehicle. We conclude that the waiver rule is not unconstitutional, and we see no persuasive reason not to apply it in the present case. We further conclude that, on the basis of all of the evidence presented to the jury, there was sufficient evidence to support the defendant's conviction.

## A

In *State* v. *Rutan*, supra, 194 Conn. 439, the defendant challenged the validity of the waiver rule, and claimed that the trial court improperly denied his motion for a judgment of acquittal at the close of the state's case. In determining whether the defendant's claim was reviewable, we stated: "Under the waiver rule, when a motion for [a judgment of] acquittal at the close of the state's case is denied, a defendant may not secure appellate review of the trial court's ruling without [forgoing] the right to put on evidence in his or her own behalf. The defendant's sole remedy is to remain silent and, if convicted, to seek reversal of the conviction because of insufficiency of the state's evidence. If the defendant elects to introduce evidence, the appellate review encompasses the evidence in toto. The defendant then runs the risk that the testimony of defense witnesses will fill an evidentiary gap in the state's case. The waiver rule, therefore, forces the defendant to choose between waiving the right to [present] a defense and waiving the right to put the state to its proof. It is doubtful whether a criminal defendant should be placed in such a dilemma." Id., 440–41. "Accordingly, in an appropriate case, we may well conclude that the denial of a defendant's motion for acquittal at the close of the state's case may be assignable as error on appeal from a conviction, whether or not the defendant has introduced evidence in his or her own behalf."[11] Id., 444.

It was unnecessary for us to reach the validity of the waiver rule in *Rutan*, however, because we concluded

---

[11] The defendant gives too much credence to this last sentence of the quoted passage from *Rutan*. This language does not, as the defendant suggests, mean that this court viewed the waiver rule as "a legal dinosaur, ticketed for extinction," and intended to abandon the rule entirely; rather, this court merely noted that, *should an appropriate case present itself*, we might conclude the rule is unconstitutional. Thus, we simply reserved, for a case in which it was appropriate, the question of the constitutionality of the waiver rule.

that there had been sufficient evidence presented during the state's case-in-chief. Id., 445. By the same token, although criminal defendants have attacked the validity of the waiver rule since *Rutan* was decided, it has been unnecessary for us to apply the rule, or reconsider its validity, because, in those cases, the state also had presented sufficient evidence in its case-in-chief.[12] See, e.g., *State* v. *Calonico*, 256 Conn. 135, 139–40, 770 A.2d 454 (2001); *State* v. *Cassidy*, 236 Conn. 112, 135 n.25, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996); *State* v. *Medina*, 228 Conn. 281, 302–303 n.28, 636 A.2d 351 (1994); *State* v. *Williams*, 202 Conn. 349, 351 n.3, 521 A.2d 150 (1987); *State* v. *Lizzi*, 199 Conn. 462, 465, 508 A.2d 16 (1986); but see *State* v. *Simino*, 200 Conn. 113, 118–19, 509 A.2d 1039 (1986) (reviewing evidence in toto). In the present case, however, the evidence presented during the state's case-in-chief was especially thin with respect to a pivotal element of the state's case, namely, how much alcohol the defendant had consumed on the evening of the accident.[13] Accordingly, although we express no conclu-

[12] The Appellate Court has noted our criticism of the waiver rule in the criminal context, but has nevertheless continued to follow the rule because this court has not explicitly abandoned it. See *Elliott* v. *Larson*, 81 Conn. App. 468, 472, 840 A.2d 59 (2004) ("[a]lthough we have questioned the continuing viability of the waiver rule in the criminal context . . . we have never questioned its applicability in the civil context" [internal quotation marks omitted]); *State* v. *Rodriguez*, 69 Conn. App. 779, 786, 796 A.2d 611 ("[d]espite its criticism of the waiver rule, our Supreme Court has not expressly abandoned it"), cert. denied, 260 Conn. 938, 802 A.2d 91 (2002); *State* v. *Wright*, 62 Conn. App. 743, 749 n.5, 774 A.2d 1015 ("[w]e are mindful that the application of the waiver rule in criminal cases has been criticized"), cert. denied, 256 Conn. 919, 774 A.2d 142 (2001); *State* v. *Roy*, 34 Conn. App. 751, 766 n.13, 643 A.2d 289 (1994) ("our Supreme Court has acknowledged the criticism of the waiver rule and . . . because the waiver rule represents the existing law on this subject in our state, we apply it in this case" [citations omitted]), rev'd on other grounds, 233 Conn. 211, 658 A.2d 566 (1995).

[13] Indeed, the only evidence that related to *the defendant's* consumption of alcohol was the testimony of Medvegy, who indicated that the defendant was drinking scotch on the evening of the accident. Medvegy could not, however, recall how much the defendant had had to drink that evening. Neither Grosner nor Fidaleo, who were working as bartenders at Tavern

sion as to the sufficiency of state's case-in-chief,[14] because of the lingering question in our jurisprudence of the validity of the waiver rule; see footnote 12 of this opinion; we now address the defendant's claim that the waiver rule is unconstitutional.[15] We conclude that it is not. Furthermore, we reaffirm that the waiver rule is followed in this state, and we apply it in the present case.[16]

---

on the Main and La Cucina, respectively, could, when asked to do so, identify the defendant—except inasmuch as Fidaleo testified that he served a "G.Q. looking guy." In addition, with respect to Grosner's testimony that he recalled serving beer to two men at Tavern on the Main, there was no evidence that suggested that either the defendant or the victim had been to Tavern on the Main on the evening of the accident. Thus, notwithstanding the defendant's conduct immediately following the accident, on which the state so heavily relies for its proposition that a sober person would not have fled the accident scene, there was no evidence presented that could have guided the jury in determining *how much* the defendant had had to drink on the evening of the accident.

[14] The state argues that, because there was sufficient evidence presented during its case-in-chief, we need not address the validity of the waiver rule. Without belaboring the point, it suffices to say that the defendant has demonstrated a sufficient doubt with respect to the sufficiency of the state's case in order to warrant a discussion of the validity of the waiver rule. See footnote 13 of this opinion. In addition, we take this opportunity to resolve the apparent uncertainty that exists in the Appellate Court regarding the application of the waiver rule. See footnote 12 of this opinion.

[15] Because the parties' briefs originally were filed in the Appellate Court; see footnote 1 of this opinion; and discussed the waiver rule from the perspective of that court, the parties filed in this court, upon our request, supplemental briefs addressing the validity of the waiver rule.

[16] For the sake of clarity, we reiterate that, if the defendant elects to introduce evidence following the denial of a motion for a judgment of acquittal, appellate review of the defendant's conviction encompasses all of the evidence presented to the jury, irrespective of the sufficiency of evidence presented during the state's case-in-chief. Thus, notwithstanding our cases decided after *Rutan*, as previously discussed, that affirmed the defendant's conviction on the basis of the state's case-in-chief; cf. *State* v. *Rodriguez*, 69 Conn. App. 779, 786, 796 A.2d 611 ("when addressing a claim challenging the propriety of a court's ruling on a motion for a judgment of acquittal at the close of the state's case-in-chief, our Supreme Court customarily has granted review and considered only the evidence that has been presented by the state in its case-in-chief, regardless of whether the defendant has presented evidence"), cert. denied, 260 Conn. 938, 802 A.2d 91 (2002); it is not appropriate to evaluate separately the state's case-in-chief *before* reviewing all of the evidence presented at trial; rather, an

## B

The defendant claims that the waiver rule impermissibly burdens a criminal defendant's constitutional rights, namely: the right to have the state prove every element of a crime beyond a reasonable doubt; *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) ("[d]ue [p]rocess [c]lause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); the right to present a defense contained in the sixth amendment to the constitution of the United States[17] and article first, § 8, of the constitution of Connecticut;[18] and the privilege against self-incrimination contained in the fifth amendment to the constitution of the United States[19] and article first,

appellate court should proceed directly to the evidence in toto. See *State* v. *Simino*, supra, 200 Conn. 118–19 (proceeding directly to evidence in toto).

[17] The sixth amendment to the constitution of the United States provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

[18] Article first, § 8, of the constitution of Connecticut, as amended by articles seventeen and twenty-nine of the amendments, provides in relevant part: "a. In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law, except in the armed forces, or in the militia when in actual service in time of war or public danger."

[19] The fifth amendment to the constitution of the United States provides: "No person shall be held to answer for a capital, or otherwise infamous

§ 8, of the constitution of Connecticut.[20] Specifically, the defendant claims that the waiver rule impermissibly forces a defendant to choose between these fundamental rights.[21] We disagree.

Although the waiver rule arguably may affect the way in which a criminal defendant conducts his defense at trial, it cannot reasonably be maintained that the rule, as a general matter, violates any constitutional right. "The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." (Internal quotation marks omitted.) *McKune* v. *Lile*, 536 U.S. 24, 41, 122 S. Ct.

---

crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

[20] Although the defendant presents arguments under both the federal and state constitutions, he does not contend that the state constitution provides an independent basis for challenging the rule. See *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992) (criteria for interpreting state constitution). Thus, we will discuss both sources of rights contemporaneously.

[21] The defendant argues, for example, that, if the trial court improperly fails to grant a defendant's motion for a judgment of acquittal, the defendant faces an unduly burdensome choice: he can either present a defense, thereby waiving his due process right to force the state to prove every element of the offense beyond a reasonable doubt; or he can remain silent, and waive his sixth amendment right to present a defense. Although we agree with the defendant to the extent that a criminal defendant is indeed faced with a difficult choice, as the foregoing discussion makes clear, the mere presence of such a choice does not make the waiver rule unconstitutional. See *State* v. *Alexander*, 254 Conn. 290, 298, 755 A.2d 868 (2000) ("the Constitution does not forbid every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights" [internal quotation marks omitted]), quoting *Jenkins* v. *Anderson*, 447 U.S. 231, 236, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980).

2017, 153 L. Ed. 2d 47 (2002), quoting *McGautha* v. *California*, 402 U.S. 183, 213, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971). The waiver rule simply is one of a myriad of considerations that a defendant must take into account when planning his defense; but that does not make the rule unconstitutional.

On a more basic level, the waiver rule merely governs *the appellate review* of a criminal defendant's trial; it does not govern the trial itself. It is well settled that a criminal defendant does not have a constitutional right to an appeal; rather, that right exists solely by statute. *State* v. *James*, 261 Conn. 395, 404 n.12, 802 A.2d 820 (2002); see also *Lackawanna County District Attorney* v. *Coss*, 532 U.S. 394, 402, 121 S. Ct. 1567, 149 L. Ed. 2d 608 (2001). Put another way, although it is axiomatic that the state may not convict a defendant unless it provides to that defendant certain constitutional safeguards, the right to appeal is *not* one of those safeguards. In this regard, it is difficult to say that the waiver rule implicates, let alone violates, any of a criminal defendant's various rights to a fair trial. Indeed, we would be hard pressed to say that, although the constitution does not require that we review the defendant's conviction, it prevents us from reviewing the defendant's conviction on the basis of the totality of evidence presented at trial.[22]

---

[22] The defendant's claim that the waiver rule is unconstitutional is not analogous to those cases in which the United States Supreme Court has held that, once the right to appeal has been made available in certain instances, the state may not restrict *access* to that right, because those cases presented claims that the right to appeal was afforded to some and not to others, in violation of the equal protection clause. See *M.L.B.* v. *S.L.J.*, 519 U.S. 102, 119–21, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996) (statutory scheme that conditioned parent's right to appeal from termination of parental rights decree on prepayment of record preparation fees held unconstitutional); *Mayer* v. *Chicago*, 404 U.S. 189, 196–97, 92 S. Ct. 410, 30 L. Ed. 2d 372 (1971) (rule that conditioned appeals from nonfelony convictions on procurement of trial transcript held unconstitutional); *Griffin* v. *Illinois*, 351 U.S. 12, 18–19, 76 S. Ct. 585, 100 L. Ed. 891 (1956) (rule that conditioned appeals from felony convictions on procurement of trial transcript held unconstitu-

We now turn to the specific constitutional provisions on which the defendant relies. As an initial matter, the defendant misconstrues the impact of the waiver rule on a defendant's due process right to have the state prove every element of an offense beyond a reasonable doubt. It is well settled that a criminal defendant is constitutionally entitled "to a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi* v. *New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The defendant quotes *State* v. *Hill*, 201 Conn. 505, 512, 523 A.2d 1252 (1986), wherein we stated: "An accused has a fundamental right, protected by the due process clauses of the federal and Connecticut constitutions, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt." That passage, written in the context of the trial court's duty properly to instruct the jury on the essential elements of a crime, was not intended to mean that, without more, it is a denial of a defendant's due process rights to deny improperly a motion for a judgment of acquittal *at the close of the state's case*; rather, it merely means that, in order for a verdict of guilty to be imposed, the state must have proven all of the elements of a charged crime to the trier of fact. See *In re Winship*, supra, 397 U.S. 363 (criminal defendant is "entitled to an acquittal of the specific crime charged *if upon all the evidence* there is reasonable doubt whether he was capable in law of committing crime" [emphasis added]). The waiver rule does not infringe on this right. Even if a trial court improperly denies a motion for a judgment of acquittal, the state still must present its case to the trier of fact, with or without evidence presented by the defendant. Put another way, the defendant's due process right to have the state prove

tional); see also *In re Samantha C.*, 268 Conn. 614, 657–59, 847 A.2d 883 (2004) (discussing *M.L.B.*).

guilt beyond a reasonable doubt, does not mean that, as the defendant's argument suggests, he has a due process right to have the state's burden evaluated on only *the state's evidence,* to the exclusion of the evidence that the defendant chose to present and that the jury heard.

We also reject the defendant's claim that the waiver rule impermissibly burdens his right to present a defense. Indeed, it is the fact that the defendant *did* present a defense that he now finds objectionable on appeal. The defendant was neither forced to nor prevented from rebutting the state's case-in-chief; he presumably did so as a matter of trial strategy.

Lastly, the defendant's claim that the waiver rule violates the privilege against self-incrimination simply is contrary to well established law. The waiver rule does not "compel" a defendant, in a fifth amendment sense, to testify at all. It merely allows a reviewing court to consider a defendant's testimony as part of the record, just as the jury was able to consider that testimony as evidence. "A defendant whose motion for acquittal at the close of the government's case is denied must then elect whether to stand on his motion or to put on a defense, with the accompanying risk that in doing so he will augment the government's case against him. *McGautha* v. *California,* [supra, 402 U.S. 215]. In each of these situations, there are undoubted pressures— generated by the strength of the government's case against him—pushing the criminal defendant to testify. But it has never been suggested that such pressures constitute 'compulsion' for Fifth Amendment purposes." *Ohio Adult Parole Authority* v. *Woodard,* 523 U.S. 272, 287, 118 S. Ct. 1244, 140 L. Ed. 2d 387 (1998). "Again, it is not thought inconsistent with the enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify." (Internal quotation marks omitted.)

*Ohler* v. *United States,* 529 U.S. 753, 759–60, 120 S. Ct. 1851, 146 L. Ed. 2d 826 (2000), quoting *McGautha* v. *California,* supra, 215.

Having concluded that the application of the waiver rule is constitutionally permissible, we now explain briefly why we follow it.[23] The waiver rule supports

---

[23] Every federal Circuit Court of Appeals presently follows the waiver rule. See *United States* v. *Barnes,* 890 F.2d 545, 549 (1st Cir. 1989); *United States* v. *Velasquez,* 271 F.3d 364, 370 (2d Cir. 2001); *United States* v. *Trotter,* 529 F.2d 806, 809 n.3 (3d Cir. 1976); *United States* v. *Thomas,* 52 F.3d 82, 85 n.* (4th Cir. 1995); *United States* v. *Perry,* 638 F.2d 862, 870 (5th Cir. 1981); *United States* v. *Black,* 525 F.2d 668, 669 (6th Cir. 1975); *United States* v. *Roman,* 728 F.2d 846, 858 (7th Cir.), cert. denied, 466 U.S. 977, 104 S. Ct. 2360, 80 L. Ed. 2d 832 (1984); *United States* v. *Wetzel,* 514 F.2d 175, 177 (8th Cir.), cert. denied, 423 U.S. 844, 96 S. Ct. 80, 46 L. Ed. 2d 65 (1975); *United States* v. *Martinez,* 514 F.2d 334, 337 (9th Cir. 1975); *United States* v. *Boss,* 671 F.2d 396, 401 (10th Cir. 1982); *United States* v. *Contreras,* 667 F.2d 976, 980 (11th Cir.), cert. denied, 459 U.S. 849, 103 S. Ct. 109, 74 L. Ed. 2d 97 (1982); *United States* v. *Foster,* 783 F.2d 1082, 1085–86 (D.C. Cir. 1986). In addition, the state has pointed out that at least thirty-one states apply the waiver rule. See *State* v. *Eastlack,* 180 Ariz. 243, 258, 883 P.2d 999 (1994), cert. denied, 514 U.S. 1118, 115 S. Ct. 1978, 131 L. Ed. 2d 866 (1995); *Key* v. *State,* 325 Ark. 73, 75–76, 923 S.W.2d 865 (1996); *Silcott* v. *People,* 176 Colo. 442, 445, 492 P.2d 70 (1971); *Guishard* v. *United States,* 669 A.2d 1306, 1312 (D.C. 1995); *State* v. *Halemanu,* 3 Haw. App. 300, 303, 650 P.2d 587 (1982); *People* v. *Clark,* 221 Ill. App. 3d 303, 310, 581 N.E.2d 722 (1991); *Davidson* v. *State,* 580 N.E.2d 238, 242 (Ind. 1991); *State* v. *Blue,* 225 Kan. 576, 577–78, 592 P.2d 897 (1979); *State* v. *Smith,* 332 So. 2d 773, 775 (La. 1976); *State* v. *Pottle,* 384 A.2d 55, 56–57 (Me. 1978); *Simpson* v. *State,* 77 Md. App. 184, 188–89, 549 A.2d 1145 (1988); *State* v. *Currie,* 274 Minn. 160, 162, 143 N.W.2d 58 (1966); *Shelton* v. *State,* 853 So. 2d 1171, 1186 (Miss. 2003); *State* v. *Purlee,* 839 S.W.2d 584, 587 (Mo. 1992); *State* v. *Gray,* 239 Neb. 1024, 1027, 479 N.W.2d 796 (1992); *State* v. *Aranda,* 94 N.M. 784, 786, 617 P.2d 173 (1980); *People* v. *Hines,* 97 N.Y.2d 56, 61, 762 N.E.2d 329, 736 N.Y.S.2d 643 (2001); *State* v. *Graves,* 343 N.C. 274, 277–78, 470 S.E.2d 12 (1996); *State* v. *VanNatta,* 506 N.W.2d 63, 70–71 (N.D. 1993); *Snow* v. *State,* 876 P.2d 291, 295–96 (Okla. Crim. 1994); *Commonwealth* v. *Wallace,* 522 Pa. 297, 315, 561 A.2d 719 (1989); *State* v. *Marini,* 638 A.2d 507, 511 (R.I. 1994); *State* v. *Harry,* 321 S.C. 273, 277, 468 S.E.2d 76 (1996); *State* v. *Goff,* 292 N.W.2d 311, 311–12 (S.D. 1980); *State* v. *Campbell,* 904 S.W.2d 608, 611 (Tenn. Crim. App. 1995); *Velasquez* v. *State,* 815 S.W.2d 842, 845 (Tex. App. 1991); *State* v. *Stockton,* 6 Utah 2d 212, 215, 310 P.2d 398 (1957); *Sheppard* v. *Commonwealth,* 250 Va. 379, 386, 464 S.E.2d 131 (1995); *State* v. *Pietrzak,* 110 Wash. App. 670, 680, 41 P.3d 1240 (2002); *State* v. *Simplot,* 180 Wis. 2d 383, 399–400, 509 N.W.2d 338 (1993); *Newell* v. *State,* 548 P.2d 8, 14 (Wyo. 1976). On the other side of the equation, we are aware of seven states that

fact-finding and the ultimate truth seeking function of a trial. Cf. *State* v. *Christian*, 267 Conn. 710, 727–28, 841 A.2d 1158 (2004) (testimonial privilege "must be applied . . . cautiously and with circumspection because it impedes the truth-seeking function of the adjudicative process" [internal quotation marks omitted]); *State* v. *Nguyen*, 253 Conn. 639, 649, 756 A.2d 833 (2000) ("right to have witnesses sequestered is an important right that facilitates the truth-seeking and fact-finding functions of a trial" [internal quotation marks omitted]); *State* v. *Morales*, 232 Conn. 707, 723, 657 A.2d 585 (1995) ("the criminal trial is a search for truth" [internal quotation marks omitted]); *State* v. *Jarzbek*, 204 Conn. 683, 692–93, 529 A.2d 1245 (1987) (allowing videotaped testimony of minor permissible because it advances truth-seeking goals of confrontation), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988). In this regard, the waiver rule eliminates the bizarre result that could occur in its absence, namely, that a conviction could be reversed for evidentiary insufficiency, despite evidence in the record sufficiently establishing guilt.

Indeed, the present case provides such an example. The defendant claims that the state failed to present sufficient evidence that he consumed alcohol, but the defendant testified to that fact on his direct examination, unprompted by the state. The failure to apply the waiver rule in the present case would force this court to ignore the most reliable evidence relating to how much alcohol the defendant had consumed before the

do not apply the waiver rule, and all have elected not to do so for reasons unrelated to the constitution. See *Ex parte Hardley*, 766 So. 2d 154, 157–58 (Ala. 1999); *In re Anthony J.*, 117 Cal. App. 4th 718, 730, 11 Cal. Rptr. 3d 865 (2004); *Cline* v. *State*, 720 A.2d 891, 892 n.6 (Del. 1998); *Walker* v. *State*, 604 So. 2d 475, 476–77 (Fla. 1992); *Commonwealth* v. *Kelley*, 370 Mass. 147, 149–50, 346 N.E.2d 368 (1976); *People* v. *Garcia*, 398 Mich. 250, 256, 247 N.W.2d 547 (1976); *State* v. *C.H.*, 264 N.J. Super. 112, 128, 624 A.2d 53 (1993); *State* v. *Bacheller*, 89 N.J.L. 433, 434–37, 98 A. 829 (N.J. Super. 1916).

accident. Just as the "harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence"; (internal quotation marks omitted) *Bunkley* v. *Commissioner of Correction*, 222 Conn. 444, 460, 610 A.2d 598 (1992); so too does the waiver rule.[24] Id. ("appellate harmless error doctrine is rooted in that fundamental purpose of our criminal justice system— to convict the guilty and acquit the innocent").

We also are not persuaded by the defendant's claim that the waiver rule is inconsistent with Practice Book §§ 42-40, 42-41 and 42-42,[25] which govern motions for

[24] We are mindful, of course, of the analogies that can be drawn against the waiver rule from the exclusionary rule, which often can exclude otherwise reliable evidence, resulting in a defendant's acquittal. "Because the exclusionary rule precludes consideration of reliable, probative evidence, it . . . undeniably detracts from the truthfinding process and allows many who would otherwise be incarcerated to escape the consequences of their actions. . . . Although we have held these costs to be worth bearing in certain circumstances, our cases have repeatedly emphasized that the rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule." (Internal quotation marks omitted.) *State* v. *Foster*, 258 Conn. 501, 506, 782 A.2d 98 (2001), quoting *Pennsylvania Board of Probation & Parole* v. *Scott*, 524 U.S. 357, 364-65, 118 S. Ct. 2014, 141 L. Ed. 2d 344 (1998). We conclude that whatever costs the waiver rule imposes on criminal defendants are outweighed by its benefits to the ultimate search for truth and meaningful appellate review of the sufficiency of the evidence. The key difference between the waiver rule and the exclusionary rule, however, is that evidence excluded under the exclusionary rule had been seized in violation of the constitution, and, therefore, for various policy reasons, should not be considered by a finder of fact in determining the defendant's guilt. Evidence not considered by an appellate court in the absence of the waiver rule, on the other hand, simply removes evidence that was considered by the jury in its finding of guilty.

[25] Practice Book § 42-40 provides: "Motions for a directed verdict of acquittal and for dismissal when used during the course of a trial are abolished. Motions for a judgment of acquittal shall be used in their place. After the close of the prosecution's case in chief or at the close of all the evidence, upon motion of the defendant or upon its own motion, the judicial authority shall order the entry of a judgment of acquittal as to any principal offense charged and as to any lesser included offense for which the evidence would not reasonably permit a finding of guilty. Such judgment of acquittal shall not apply to any lesser included offense for which the evidence would reasonably permit a finding of guilty."

judgments of acquittal.[26] Those provisions provide, among other things, that, "[a]fter the close of the prosecution's case in chief or at the close of all the evidence, upon motion of the defendant or upon its own motion, the judicial authority *shall* order the entry of a judgment of acquittal as to any principal offense charged . . . for which the evidence would not reasonably permit a finding of guilty." (Emphasis added.) Practice Book § 42-40. Although we agree with the defendant that that language means that the trial court is obliged to grant a motion for a judgment of acquittal should a proper circumstance present itself, the rule sheds no light on how this court is required *to review* the sufficiency of

Practice Book § 42-41 provides: "If the motion is made after the close of the prosecution's case in chief, the judicial authority shall either grant or deny the motion before calling upon the defendant to present the defendant's case in chief. If the motion is not granted, the defendant may offer evidence without having reserved the right to do so."

Practice Book § 42-42 provides: "If the motion is made at the close of all the evidence in a jury case, the judicial authority may reserve decision on the motion, submit the case to the jury, and decide the motion either before the jury return a verdict or after they return a verdict of guilty or after they are discharged without having returned a verdict."

[26] We also point out our disagreement with the defendant's contention that a 1994 amendment to rule 29 of the Federal Rules of Criminal Procedure "rendered moot" the application of the waiver rule in the federal courts. The effect of that 1994 amendment comes into play, however, only if the trial court reserves its decision on the motion for a judgment of acquittal presented at the close of the government's case; if the trial court *denies* that motion, as it did in the present case, the waiver rule applies as it ordinarily would. See *United States* v. *Velasquez*, 271 F.3d 364, 371 (2d Cir. 2001).

Moreover, unlike the federal rules, our rules of practice do not permit the trial court to reserve its decision on a motion for a judgment of acquittal presented at the close of the state's case. See footnote 25 of this opinion. Thus, those federal cases that have "refused to apply the waiver rule on appeal when the trial court improperly had reserved its ruling on such a motion"; see footnote 7 of the dissenting opinion; shed no light on our interpretation of the waiver rule because that situation, namely, a trial court's reservation on a motion for a judgment of acquittal, cannot occur in a Connecticut state court. The *only* persuasive fact that can be gleaned from federal practice on this issue is that the waiver rule is universally applied in the federal courts. See footnote 23 of this opinion.

the evidence following the trial court's denial of such a motion and a jury's verdict of guilty.[27] There undoubtedly will be situations in which reasonable minds could differ regarding whether the particular facts at the close of the state's case could support a verdict of guilty, but once a case is submitted to a jury, however erroneously, and the jury returns a verdict of guilty, review of the evidence ought to be on the basis of that evidence that was before the jury. See *People* v. *Hines*, 97 N.Y.2d 56, 61, 762 N.E.2d 329, 736 N.Y.S.2d 643 (2001) ("[c]onsistent with the overall truth-seeking function of a jury trial, the rationale underlying [the waiver] rule is that a reviewing court should not disturb a guilty verdict by reversing a judgment based on insufficient evidence without taking into account all of the evidence the jury considered in reaching that verdict, including proof adduced by the defense"). After all, on an appeal claiming insufficiency of the evidence following a jury's verdict of guilty, it is the propriety of the jury's verdict that we are reviewing, not the propriety of the trial court's submission of the case to the jury. We simply

---

[27] The decision to grant a motion for a judgment of acquittal, of course, should not be taken lightly because the state cannot obtain appellate review of that determination. "Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that [a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution. . . . *United States* v. *Martin Linen Supply Co.*, [430 U.S. 564, 571, 97 S. Ct. 1349, 51 L. Ed. 2d 642 (1977)]. A judgment of acquittal, whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is insufficient to convict, may not be appealed and terminates the prosecution when a second trial would be necessitated by a reversal. *United States* v. *Scott*, [437 U.S. 82, 91, 98 S. Ct. 2187, 57 L. Ed. 2d 65, reh. denied, 439 U.S. 883, 99 S. Ct. 226, 58 L. Ed. 2d 197 (1978)]." (Citation omitted; internal quotation marks omitted.) *State* v. *Paolella*, 210 Conn. 110, 122, 554 A.2d 702 (1989). In this regard, the failure to follow the waiver rule would give the defendant the best of both worlds: if his motion for a judgment of acquittal is granted, the trial has ended and the state cannot obtain review of the trial court's ruling; if his motion is denied, he would be able to secure appellate review of that denial, irrespective of the evidence that was ultimately submitted to the jury.

conclude that, when a reviewing court is faced with a choice between two records—one encompassing some of the evidence presented at trial and one encompassing all of the evidence presented at trial—the latter is the preferable record on which to determine whether a defendant is entitled to a reversal of his conviction.

Finally, we decline to exercise our supervisory authority by refusing to apply the waiver rule in the present case. The defendant argues that, because he was charged with multiple crimes, namely, vehicular manslaughter, vehicular misconduct and evading responsibility, he could not present exculpatory evidence with respect to the evading responsibility charge without also introducing, or allowing the state to draw out, potentially inculpatory evidence with respect to the other charges.[28] We are not persuaded.

The defendant's position does not differ from that of any defendant charged with multiple crimes. It was his choice, as a matter of trial strategy, to inject into the trial whatever issues that he concluded would be beneficial to his defense. Conversely, the defendant was free to avoid any issues on direct examination that he did not want drawn out by the state. *State* v. *Ramos*, 261 Conn. 156, 176, 801 A.2d 788 (2002) ("[i]t is a well established rule of evidence that cross-examination is restricted to matters covered on direct examination"). The defendant also was free to, and did not, request a severance of the charges against him pursuant to Practice Book § 41-18.[29] Those points aside, it suffices to

---

[28] Specifically, the defendant claims that he sought to introduce the testimony of Selig regarding his traumatic brain injury to demonstrate that he did not purposefully leave the scene of the accident, which necessarily opened the door to what the defendant told Selig regarding his consumption of alcohol.

[29] Practice Book § 41-18 provides: "If it appears that a defendant is prejudiced by a joinder of offenses, the judicial authority may, upon its own motion or the motion of the defendant, order separate trials of the counts or provide whatever other relief justice may require."

say that, as previously discussed, the pressures that pushed the defendant into introducing, or opening the door to, evidence of his consumption of alcohol at trial do not outweigh the truth seeking interest, *on appeal*, in reviewing the record as it was presented to the jury.

The dissent, although agreeing that the waiver rule is constitutional, urges that we exercise our supervisory power to abolish it because it "places a criminal defendant on the horns of an unfair dilemma, forcing him to choose between two equally fundamental rights: the right to present a defense, and the right to have the state bear the burden of proving each and every element of a charged crime beyond a reasonable doubt." Thus, the dissent contends, the rule "presents a defendant whose motion to dismiss has been erroneously denied with a Hobson's choice:[30] resting and sacrificing the right to present a defense out of fear that his or her testimony may cure defects in the prosecution's case, or putting on such evidence and thereby possibly assisting the prosecution in proving its case." (Internal quotation marks omitted.) We disagree.

First, although we agree that the waiver rule presents the defendant with a difficult dilemma, we disagree that it is an "unfair" dilemma. In addition to the foregoing discussion regarding the constitutionality of the waiver rule, our criminal justice system puts defendants to similar choices, namely, choosing between a particular constitutional right and putting on evidence of his or her own; but none of these choices ever has been regarded as unfair. For example, a defendant must always choose between standing on his constitutional right to remain silent and taking the stand in presenting his defense, which may, for example, result in exposure

---

[30] We note our agreement, however, with footnote 2 of the dissent, which, relying properly on *State* v. *Messler*, 19 Conn. App. 432, 436 n.3, 562 A.2d 1138 (1989), has, once and for all, we expect, clarified the true nature of a "Hobson's choice."

to the jury of his prior criminal record for purposes of impeachment, or simply may expose himself to cross-examination that will strengthen the state's case or diminish his credibility with the jury. In addition, if his motion to suppress either his confession or evidence seized has been granted, he must choose between resting on his claims that the motions were properly granted and presenting his defense by taking the stand, thereby subjecting himself to impeachment by the suppressed evidence. See *State* v. *Burge*, 195 Conn. 232, 250–51, 487 A.2d 532 (1985) ("Evidence may be admissible for purposes of impeachment even though it was obtained in violation of the fourth amendment or the requirements of *Miranda* [v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]. See *United States* v. *Havens*, 446 U.S. 620, 627–28, 100 S. Ct. 1912, 64 L. Ed. 2d 559 (1980); *Oregon* v. *Hass*, 420 U.S. 714, 723–24, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975); *Harris* v. *New York*, 401 U.S. 222, 226, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971) . . . ." [Citations omitted.]); see also *Pennsylvania Board of Probation & Parole* v. *Scott*, 524 U.S. 357, 364 n.4, 118 S. Ct. 2014, 141 L. Ed. 2d 344 (1998). In both instances, the question faced by the defendant essentially is tactical in nature, and in both instances the truth seeking function of the criminal trial trumps the propriety vel non of the ruling on the defendant's motion.

Second, in our view, the dissent's reliance on our supervisory authority over the administration of criminal justice is misplaced and, in fact, that authority, which is designed to protect the integrity of the judicial system and "the perceived fairness of the judicial system as a whole"; (internal quotation marks omitted) *State* v. *Valedon*, 261 Conn. 381, 386, 802 A.2d 836 (2002); counsels for, rather than against, the waiver rule. We often have stated that the "fundamental purpose of our criminal justice system [is] to convict the guilty and

acquit the innocent." *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 460. Like the harmless error doctrine, that purpose "promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." (Citation omitted; internal quotation marks omitted.) Id. Public respect for that process will be enhanced, rather than diminished, as the dissent suggests, by requiring that the validity of a jury's guilty verdict be measured by *all* of the evidence on which the jury relied, rather than only that evidence that preceded an erroneous denial of the defendant's motion for a judgment of acquittal, followed by the presentation of his own evidence.[31]

In sum, the abolition of the waiver rule rests, at bottom, on a perception of the criminal trial as a sporting event in which the rules of the game trump the search for truth. We decline the dissent's implied invitation to join in that perception.

C

Having concluded that the waiver rule applies in the present case, we turn to the sufficiency of the evidence to support the jury's verdict. The defendant claims that, with respect to the charge of manslaughter in the second degree with a motor vehicle, there was insufficient evidence presented during the entire trial to support the jury's verdict of guilty.[32] We disagree.

[31] Consider, for example, a case in which, after such a denial, the defendant testifies and, under skillful cross-examination, admits, either explicitly or implicitly, his guilt of the crime charged. It hardly can increase public respect for the criminal process for an appellate court to set that defendant free because the trial court erroneously denied his motion for a judgment of acquittal at an earlier stage of the trial. In such a case, in our view, that denial becomes, by virtue of the defendant's own evidence, "immaterial error." (Internal quotation marks omitted.) *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 460.

[32] The defendant does not challenge the sufficiency of the evidence presented during the entire trial with respect to the charges of misconduct with a motor vehicle and evading responsibility in the operation of a motor

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Newsome*, 238 Conn. 588, 616, 682 A.2d 972 (1996).

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Id., 617.

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reason-

---

vehicle. We confine our discussion, therefore, to only the charge of manslaughter in the second degree with a motor vehicle.

able and logical. . . . *State* v. *McMahon*, 257 Conn. 544, 566–67, 778 A.2d 847 (2001).

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty. . . . Id., 567." *State* v. *Meehan*, 260 Conn. 372, 377–79, 796 A.2d 1191 (2002).

In order to convict a defendant of manslaughter in the second degree with a motor vehicle under § 53a-56b, the state is required to prove that (1) the defendant caused the death of another person (2) while operating a motor vehicle (3) under the influence of intoxicating liquor or any drug and (4) the victim's death was a consequence of the effect of such liquor or drug. See footnote 2 of this opinion. In this context, "under the influence of intoxicating liquor," means that, as a result of drinking such intoxicating liquor, the defendant's mental, physical, or nervous processes "have become so affected that he lacks to an appreciable degree the ability to function properly in relation to the operation of his motor vehicle." (Internal quotation marks omitted.) *State* v. *Sanko*, 62 Conn. App. 34, 41, 771 A.2d 149, cert. denied, 256 Conn. 905, 772 A.2d 599 (2001).

The defendant does not dispute the sufficiency of the evidence with respect to whether he caused the death of the victim while operating a motor vehicle; rather, the defendant contends that the state failed to prove that he was under the influence of intoxicating liquor.

The inquiry becomes, therefore, whether there was suf-
ficient evidence for the jury to find that, as a result of
consuming alcohol, the defendant was affected to the
extent that he lacked to an appreciable degree the abil-
ity to function properly in relation to the operation of
his motor vehicle.

The jury reasonably could have found that, on the
basis of the testimony of the defendant, Selig and Fida-
leo, the defendant had consumed one and one-half beers
at Tavern on the Main and three two ounce glasses of
scotch at La Cucina. In addition, Milzoff testified that
one twelve ounce beer or one ounce of eighty proof
scotch equals one dose of alcohol, and that as one
consumes more doses of alcohol, the resulting effects,
namely, the inhibition of one's reflexes, become more
severe. Thus, viewing the evidence in the light most
favorable to sustaining the verdict, the jury reasonably
could have found that the defendant had consumed
seven and one-half doses of alcohol in the hours preced-
ing the crash. It was not unreasonable for the jury to
consider this evidence and infer, on the basis of its
general awareness of drinking and driving, that these
seven doses of alcohol adversely affected the defen-
dant's ability to operate a motor vehicle. See *Craig* v.
*Driscoll*, 262 Conn. 312, 337, 813 A.2d 1003 (2003) ("we
are mindful of the horrors that result from drinking and
driving, horrors to which unfortunately we have grown
more accustomed"); id., 337 n.17 (discussing alcohol
related traffic accident statistics); *State* v. *Jones*, 124
Conn. 664, 667, 2 A.2d 374 (1938) ("condition of intoxi-
cation and its common accompaniments are a matter
of general knowledge"); *State* v. *McNally*, 39 Conn. App.
419, 427, 665 A.2d 137 (*O'Connell, J.*, dissenting) (same),
cert. denied, 235 Conn. 931, 667 A.2d 1269 (1995); *State*
v. *Lamme*, 19 Conn. App. 594, 606, 563 A.2d 1372 (1989)
(same), aff'd, 261 Conn. 172, 579 A.2d 484 (1990).

Other evidence supported this inference as well. First, the jury reasonably could have found that facts associated with the crash itself were indicative of driving under the influence of alcohol to the requisite degree. The defendant was driving thirty miles per hour above the speed limit while traveling on a wet, curvy road. The defendant's vehicle skidded off the road, traveled on dirt and grass at a rate of twenty-four miles per hour, and did not stop until it hit a tree.

Second, the jury reasonably could have found that the defendant's conduct immediately after the crash was indicative that he was trying to conceal the fact that he had been under the influence of alcohol. See *State* v. *Pappas*, 256 Conn. 854, 892, 776 A.2d 1091 (2001) (conduct evincing consciousness of guilt is relevant and admissible). Despite the defendant's testimony that he called 911, he fled the accident scene and called Habetz for a ride, rather than waiting for emergency personnel to arrive. In addition, despite the defendant's extensive injuries, he did not seek medical attention until the next afternoon.

## II

## EXCLUSION OF CERTAIN EVIDENCE

The defendant next claims that the trial court improperly excluded evidence tending to show that he did not intentionally leave the scene of the accident, thereby rebutting certain elements of the evading responsibility charge and the state's consciousness of guilt theory. Specifically, the defendant claims that the trial court improperly excluded, on relevance and hearsay grounds: (1) the defendant's statements made to Habetz indicating that the defendant wanted to return to the accident scene; (2) evidence demonstrating that Habetz prevented the defendant from returning to the accident scene; and (3) evidence demonstrating why Habetz was of the opinion that the defendant needed an attorney,

as well as evidence of Habetz' background as a police commissioner tending to demonstrate his basis for such an opinion. We conclude that none of this evidence was improperly excluded.

The following additional facts are necessary to resolve this issue. As previously discussed, Habetz testified during the state's case-in-chief that he received several telephone calls from the defendant immediately after the accident, and that he picked up the defendant shortly thereafter. On cross-examination, the defendant's counsel asked Habetz what the defendant had said over the telephone to him, including where the defendant had said that he wanted to go. The state objected on hearsay grounds, and, after a colloquy outside the presence of the jury,[33] the trial court sustained the state's objections. During this time, the defendant's counsel also asked Habetz if he had suggested to the defendant that the defendant contact the police, and whether Habetz and the defendant had had any disagreements while in Habetz' car. The state objected on the ground that the questions were beyond the scope of direct examination, and the trial court sustained the state's objections. Finally, on recross-examination, the defendant's counsel asked Habetz if he had prevented the defendant "from doing certain things." The state objected on the ground that the question was beyond the scope of direct examination, and, after a brief proffer by the defendant outside the presence of the jury, the trial court sustained the state's objection.[34]

[33] The defendant sought to admit his statement as evidence that he did not fail to report the accident insofar as Habetz was the first person that he saw after the accident.

[34] Specifically, the trial court concluded that the state originally had asked whether Habetz had prevented the defendant from leaving Habetz' vehicle, whereas, as revealed in the defendant's proffer, the defendant was asking what else Habetz had prevented the defendant from doing, namely, returning to the accident scene and checking on the condition of the victim.

Later, the defendant took the stand and testified that, after Habetz had picked him up, he told Habetz that he wanted to find out what had happened to the victim. In addition, the defendant testified that, after he had told Habetz that he had been in a car accident, the two of them went back to Habetz' house and waited to contact an attorney before contacting anyone else.

Thereafter, the defendant recalled Habetz to testify. The defendant's counsel asked Habetz if the defendant had asked Habetz to "take him any place." The defendant's counsel sought, for the purpose of rebutting the evading responsibility charge, to admit this evidence to demonstrate that it was the defendant's intention to return to the accident scene. The state objected on hearsay grounds, and the trial court sustained the objection. The trial court also sustained the state's objections, on nonspecific grounds, with respect to any testimony relating to "advice" that Habetz had given the defendant. In a similar vein, after a proffer outside the presence of the jury, the trial court disallowed testimony relating to the basis for Habetz' advice to the defendant, namely, that Habetz had a prior background as a police commissioner and some knowledge of the law. This testimony, the defendant's counsel argued, was relevant to show why Habetz "took control" of the situation and effectively prevented the defendant from returning to the accident scene. To be clear, the trial court stated that any testimony relating to Habetz' advice, i.e., not to return to the scene, to get an attorney, or that he was former police commissioner, was irrelevant, and any testimony relating to what the defendant had told Habetz, i.e., that he wanted to return to the accident scene, was hearsay.

Finally, the trial court instructed the jury that it may consider the defendant's conduct immediately after the accident as consciousness of guilt: "In any criminal trial it is permissible for the state to show the conduct of a

defendant after the time of the alleged offense may fairly have been influenced by the criminal act. That is that the conduct shows a [consciousness] of guilt. The conduct of a person in leaving the scene of a crime, if proven that he was in fact at the scene of the crime, may be considered in determining his guilt. . . . Here you may consider all the evidence that bears on the issue. Including but not limited to the residents who reported and responded to the crash scene, police and fire personnel who arrived, the testimony given by the defendant and [Habetz] as to their conduct in the aftermath . . . ."

We first set forth the standard that governs our review of a trial court's evidentiary ruling. "It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference." (Internal quotation marks omitted.) *State* v. *William C.*, 267 Conn. 686, 700, 841 A.2d 1144 (2004). In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence, including issues of relevance and the scope of cross-examination. Id., 701; *State* v. *Rizzo*, 266 Conn. 171, 285, 833 A.2d 363 (2003). Accordingly, "[t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *State* v. *William C.*, supra, 701. In determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. Id.; *State* v. *Rizzo*, supra, 285. "This deferential standard is [generally] applicable to evidentiary questions involving hearsay." (Internal quotation marks omitted.) *State* v. *Lopez*, 254 Conn. 309, 315, 757 A.2d 542 (2000).

In addition, "[t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth

amendment right to compulsory process includes the right to . . . present the defendant's version of the facts . . . to the jury so that it may decide where the truth lies. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated. . . .

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260–62, 796 A.2d 1176 (2002).

In order to understand the defendant's claims, it is necessary to parcel out each item of evidence, its proposed relevancy, and the trial court's reason for excluding it. The defendant essentially challenges the trial court's exclusion of two items of evidence: (1) the defendant's statements made to Habetz indicating that he wanted to return to the accident scene; and (2) evidence indicating that Habetz advised the defendant not to return to the scene of the accident, and Habetz' reasons for doing so. Moreover, the defendant does not challenge the trial court's rulings that certain evidence was beyond the scope of the state's direct examination of Habetz, as the same evidence also was ruled inadmissible during the defendant's direct examination of Habetz. Finally, to the extent that the defendant argues that the challenged evidence was relevant to refute

the state's consciousness of guilt theory, we decline to review that contention because that basis for admitting the evidence was not argued in the trial court. See *State v. Moye*, 214 Conn. 89, 97 n.6, 570 A.2d 209 (1990).

With respect to the defendant's statements made to Habetz indicating that he wanted to return to the accident scene, the trial court excluded such evidence on hearsay grounds. The defendant sought to introduce this testimony to demonstrate that he did not intend to leave the accident scene, and that he wanted to inquire as to the condition of the victim. This evidence was offered to establish that he did not, or at least did not intend to, evade responsibility after the accident. He argues that such statements are not hearsay, but are admissible as res gestae because they have independent legal significance. The defendant also argues that such statements fall within the state of mind exception to the hearsay rule. We conclude that, although the defendant's statements fell within the state of mind exception to the hearsay rule, they were not improperly excluded by the trial court because they were irrelevant to the charge of evading responsibility.

"An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Internal quotation marks omitted.) *State v. Rivera*, 268 Conn. 351, 360, 844 A.2d 191 (2004); see Conn. Code Evid. § 8-1 (3). "A statement made out of court is not hearsay unless it is offered to establish the truth of the facts contained in the statement." (Internal quotation marks omitted.) *Rogers* v. *Board of Education*, 252 Conn. 753, 767, 749 A.2d 1173 (2000). In the present case, the defendant sought to introduce into evidence that he had told Habetz that he wanted to return to the accident scene. This evidence was offered

to prove that the defendant did, in fact, wish to return to the accident scene. This was hearsay.

We disagree with the defendant's claim that this statement was a "verbal act." A statement constitutes a verbal act if the statement is relevant simply because the statement was made, irrespective of whether it was true or false.[35] See C. Tait, Connecticut Evidence (3d Ed. 2001) § 8.8, p. 575. "A verbal act is an out-of-court statement that causes certain legal consequences, or, stated differently, it is an utterance to which the law attaches duties and liabilities . . . [and] is admissible nonhearsay because it is not being offered for the truth of the facts contained therein. See *State* v. *Mortoro*, 157 Conn. 392, 396, 254 A.2d 574 (1969) (statement that person did a good job committing crime admitted not for its truth but to show relationship between parties in prosecution for hindering state's witness); *Gyro Brass Mfg. Corp.* v. *United Automobile, Aircraft & Agricultural Implement Workers of America, AFL-CIO*, 147 Conn. 76, 80, 157 A.2d 241 (1959) (testimony about oral modification of sales agreement was admissible nonhearsay because testimony was being offered to prove only that utterance was made, not for truth of any statements within utterance); *State* v. *Tolisano*, 136 Conn. 210, 214, 70 A.2d 118 (1949) (statements by anonymous callers to suspected bookie's apartment admissible because statements offered not for truth of their content but as proof of verbal act of placing bet) . . . ." (Citation omitted; internal quotation marks

[35] A textbook example of a verbal act is evidence that a presumably dead man had said "I am still alive." Irrespective of the veracity of that statement, the fact that the man *said something* indicates that he is, in fact, not dead. See J. Waltz & R. Park, Evidence: Cases and Materials (9th Ed. 1999) pp. 96–97. In such an instance, "[t]he relevance of the [statement] depends, therefore, not on the credibility of the out-of-court declarant . . . but on that of the testifying witness." Id., p. 102; *Ries Biologicals, Inc.* v. *Bank of Santa Fe*, 780 F.2d 888, 890 (10th Cir. 1986).

omitted.) *Urich* v. *Fish*, 261 Conn. 575, 584–85, 804 A.2d 795 (2002).

The defendant's statement that he wanted to return to the accident scene cannot be considered a verbal act because it was offered to prove just that, namely, that the defendant wanted to return to the accident scene. The statement, therefore, was offered to prove the truth of the matter asserted, and the trial court properly categorized it as hearsay.

We now turn to whether, as the defendant contends, the statement falls within the state of mind exception to the hearsay rule. See Conn. Code Evid. § 8-3 (4).[36] We conclude that, although this statement fell within this exception to the hearsay rule, the trial court did not improperly exclude it because it was irrelevant for the purpose for which it was introduced, namely, to demonstrate that the defendant's conduct after the accident did not constitute evading responsibility under § 14-224 (a). See *State* v. *DeLoreto*, 265 Conn. 145, 153, 827 A.2d 671 (2003) ("[w]here the trial court reaches a correct decision but on [mistaken] grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it" [internal quotation marks omitted]).

As previously discussed, "[a]n out-of-court statement that is offered to establish the truth of the matter asserted is inadmissible hearsay unless the statement falls within a recognized exception to the hearsay rule. . . . One such exception provides that statements expressing a declarant's present state of mind may be offered for the truth of the matter asserted, *if relevant.*

---

[36] The exception to the hearsay rule pursuant to § 8-3 (4) of the Connecticut Code of Evidence provides: "A statement of the declarant's then-existing mental or emotional condition, including a statement indicating a present intention to do a particular act in the immediate future, provided that the statement is a natural expression of the condition and is not a statement of memory or belief to prove the fact remembered or believed."

See . . . 6 J. Wigmore, Evidence (Chadbourn Rev. 1976) § 1715, p. 99 (direct assertions of the state of mind [such as] I know that I am ill, [and] I did not intend to injure Doe, are hearsay and must satisfy state of mind exception to rule to be admissible)." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 355–56, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003); see also *State* v. *Wargo*, 255 Conn. 113, 138, 763 A.2d 1 (2000) ("An out-of-court statement is not [excluded by the rule against hearsay] if it is offered to illustrate . . . the declarant's then present state of mind . . . . Of course, for any such out-of-court statement to be admissible, it must be relevant to an issue in the case." [Citations omitted; internal quotation marks omitted.]).

The defendant's statement that he wanted to return to the accident scene plainly fits within the state of mind exception pursuant to § 8-3 (4) of the Connecticut Code of Evidence because, as the exception provides, it "indicat[ed] a present intention to do a particular act in the immediate future," namely, to return to the accident scene. To the extent that the trial court's ruling rested on hearsay grounds, we conclude that it was mistaken.

The evidence, however, was not relevant because it did nothing to aid the jury with respect to the evading responsibility charge, the purpose for which the defendant offered the evidence. Specifically, the defendant's state of mind approximately thirty minutes after the accident had nothing to do with whether he had violated § 14-224 (a).

Section 14-224 (a) provides in relevant part: "Each person operating a motor vehicle who is knowingly involved in an accident which . . . results in the death of any other person shall at once stop and render such

assistance as may be needed and shall give his name, address and operator's license number and registration number to the person injured or to any officer or witness to the death or serious physical injury of any person, and if such operator . . . is unable to give his name, address and operator's license number and registration number to the person injured or to any witness or officer, for any reason or cause, such operator shall immediately report such death or serious physical injury of any person to a police officer, a constable, a state police officer or an inspector of motor vehicles or at the nearest police precinct or station, and shall state in such report the location and circumstances of the accident . . . and his name, address, operator's license number and registration number." Essentially, the statute requires, therefore, that a person involved in an accident is required to stop, render assistance, and immediately report the accident, or, if unable to do so, must report the accident as soon as possible thereafter.[37]

---

[37] The Appellate Court recently explained the elements of § 14-224 (a) as follows: "To establish a violation of § 14-224 (a), the state first had to prove that (1) the defendant was operating a motor vehicle, (2) the defendant was knowingly involved in an accident and (3) that accident caused the death or serious physical injury of any other person. Once those predicate elements were established, the state could prove a violation of § 14-224 (a) if it proved that the defendant failed to fulfill any one or more of the following duties required of him by the statute: (4) that the defendant failed to stop at once and render such assistance as may have been needed; or (5) unless there was evidence that the defendant was unable, for any reason or cause, to provide the statutorily required information at the scene, that the defendant failed to give his name, address, operator's license number and registration number to the person injured, any officer or a witness to the accident; or (6) if there was evidence that the defendant was unable, for any reason or cause, to provide the statutorily required information at the scene, that the defendant failed to report immediately the death or serious physical injury to a police officer, a constable, a state police officer or an inspector of motor vehicles, or at the nearest police precinct or station, and to give the same information as to his name, address, operator's license number and registration number to the police officer, constable, state police officer or inspector of motor vehicles together with additional information that would not have been required had the report been made at the scene of the accident, namely, the location and circumstances of the accident." *State* v. *Rosario,*

Implicit in these directives is the notion that a person involved in an accident lawfully cannot leave the accident scene until he has fulfilled his obligations to stop and report. "The purpose of the statute on evading responsibility is to ensure that when the driver of a motor vehicle is involved in an accident, he or she will promptly stop, render any necessary assistance and identify himself or herself. The essence of the offense of evading responsibility is the failure of the driver to stop and render aid." *State* v. *Johnson*, 227 Conn. 534, 544, 630 A.2d 1059 (1993).

In addition, we previously have held that whether a defendant has knowledge that an accident caused injury or damage is irrelevant to the crime of evading responsibility; rather, it is "a mandatory 'stop, ascertain and assist' statute, which provides criminal penalties for the failure to do so." Id., 543. Thus, in the present case, once the defendant left the accident scene and called Habetz instead of the police, he had violated the directive of § 14-224 (a). Evidence that the defendant wished to return to the accident scene, therefore, was not relevant to the crime of evading responsibility.

We decline to review the defendant's contention that his statements made to Habetz were relevant to refute the state's evidence of the defendant's consciousness of guilt. That basis for admitting the evidence was not argued in the trial court; rather, the defendant's sole purpose for introducing the evidence related to the evading responsibility charge. Thus, we cannot say that the trial court abused its discretion by not admitting the evidence for that alternate purpose. See *State* v. *Moye*, supra, 214 Conn. 98 n.6 ("On appeal, we will not review an evidentiary claim not raised below. Once counsel states the authority and ground of his objection,

81 Conn. App. 621, 634, 841 A.2d 254, cert. denied, 268 Conn. 923, 848 A.2d 473 (2004).

any appeal will be limited to the ground asserted." [Internal quotation marks omitted.]); *State* v. *William C.*, 71 Conn. App. 47, 67, 801 A.2d 823 (2002) ("It is well settled that the trial court can be expected to rule only on those matters that are put before it. . . . To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." [Internal quotation marks omitted.]), rev'd, *State* v. *Williams*, supra, 267 Conn. 686.

Much the same can be said with respect to the defendant's claim that the trial court improperly excluded, on relevance grounds, evidence that Habetz advised the defendant not to return to the accident scene, as well as evidence demonstrating Habetz' reasons for doing so. The defendant sought to introduce this evidence to demonstrate that Habetz prevented him from returning to the accident scene and rendering aid to the victim. The defendant argues that this evidence was relevant because it shows that he was unable to comply with § 14-224 (a). We reject this claim.

As previously discussed, § 14-224 (a) provides that, if the operator of the vehicle is "unable" to provide certain information, he must do so as soon as possible thereafter. See footnote 37 of this opinion. Evidence that Habetz advised the defendant not to return to the accident scene would not render the defendant "unable" to do anything; rather, that evidence would merely elaborate as to why the defendant chose not to return to the accident scene. We already have explained that the defendant's intent to return to the accident scene was irrelevant to the crime of evading responsibility, and so too were his reasons for not doing so.[38]

---

[38] Further, we note that the jury was able to consider most of the issues that the defendant now challenges on appeal. The defendant twice testified that he wanted to return to the accident scene, and Habetz testified that he had advised the defendant that he needed an attorney, that he took the defendant back to Habetz' home, and that going back to Habetz' home was not the defendant's " 'first choice.' "

Finally, we decline to review the defendant's contention that this evidence also was relevant to refute the state's evidence of his consciousness of guilt because it was not raised in the trial court.

## III

### REFUSAL TO STRIKE THE TESTIMONY OF MILZOFF

We now turn to the defendant's claim that the trial court improperly refused to strike the testimony of Milzoff, the state's expert in toxicology. We reject this claim.

The following additional facts are necessary to resolve this issue. Prior to trial, the defendant moved to preclude all expert testimony relating to the issue of intoxication, and argued that such evidence was subject to an analysis under *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). The trial court denied this motion. In addition, the defendant moved in limine to preclude evidence that he was intoxicated in the absence of blood alcohol data or an expert opinion. The trial court reserved decision on this motion should the state attempt to introduce such evidence, and indicated that the state would be required to conduct a full proffer outside the presence of the jury.

Accordingly, before the state presented the testimony of Milzoff in its case-in-chief with respect to the issue of alcohol consumption, a proffer was held outside the presence of the jury. During the proffer, and after asking Milzoff some general questions about alcohol, the state presented to Milzoff the following hypothetical: "Assuming that an individual has six ounces of alcohol over a one and one-half hour period of time, what effect would that have on his or her central nervous system one hour later?" Milzoff replied: "The central nervous system would be depressed to some extent."

On cross-examination during the proffer, Milzoff was asked to build upon the state's hypothetical, and estimate the blood alcohol content of an individual, with further assumptions that the individual in question weighed 210 pounds, that the alcohol was consumed between 9 and 10:30 p.m., and that the blood alcohol content was measured at 11 p.m. Milzoff replied that the blood alcohol content would be between approximately 0.02 and 0.07. The defendant argued that Milzoff should not be permitted to testify because he could not say with any certainty whether the defendant was drunk or impaired.

The trial court eventually allowed Milzoff to testify as an expert, stating: "[W]hen I consider . . . the combined proffer of the state and the defendant . . . there is enough for the jury to hear, certainly with respect to the misconduct count." The state then asked the trial court if it would be required to ask the same hypothetical in front of the jury that it had asked during the proffer. The trial court replied: "Well, I think you have relevance and materiality problems if you don't. But that's for [the defendant's counsel] to rise to the occasion on."

Thereafter, in the presence of the jury, Milzoff testified on direct examination that alcohol is a depressant, which inhibits reflexes, the ability to respond to situations, the ability to operate machinery, and the ability to perform complex tasks. Milzoff also testified that a single dose of alcohol, i.e., twelve ounces of beer or one ounce of eighty proof scotch, affects an individual to a "slight degree," and that as alcohol consumption increases, so do the resulting effects from the alcohol. The state, however, never asked Milzoff the hypothetical that it had asked during the proffer.

At the conclusion of Milzoff's direct examination, and outside the presence of the jury, the defendant's counsel

moved to strike Milzoff's testimony, arguing that the testimony was irrelevant because it was within the general knowledge of laypersons and that the state did nothing to tie Milzoff's testimony into the facts of the present case, i.e., by failing to ask the hypothetical. With regard to whether the state had been *required* to ask the hypothetical, the trial court stated: "I think I said in sum and substance that I think that there are relevance and materiality problems, but [the defendant's counsel] would rise to the occasion on that if he felt it were necessary. I think that's what I said."

The trial court then stated that it viewed the evidence as "marginally relevant, even if the state goes about doing it in a circumstantial way, as opposed to hitting the nail on the head the direct way, [but] . . . it's still likely to aid the trier in tending or not tending to prove a fact in issue, [then] why does it not come in?" The state also stated that it did not ask the hypothetical because it was trying to prevent the issue of blood alcohol content from coming before the jury.

The trial court decided to consider the matter overnight, and, the next morning, it denied the defendant's motion to strike Milzoff's testimony. The defendant requested that the trial court allow him to test the reliability of Milzoff's testimony under *State* v. *Porter*, supra, 241 Conn. 57, and the trial court denied that request.

The defendant's counsel, thereafter, cross-examined Milzoff in the presence of the jury. Milzoff indicated that he could not say whether the defendant was "slightly effected by alcohol," or whether the defendant lacked to an appreciable degree the ability to function in relation to the operation of a motor vehicle.

We first set forth the standard that governs our review of this issue, and reiterate "that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference." (Internal quotation marks omitted.) *State*

v. *William C.*, supra, 267 Conn. 700. "Concerning expert testimony specifically, we note that the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *Hayes* v. *Decker*, 263 Conn. 677, 683, 822 A.2d 228 (2003); see *State* v. *Rizzo*, supra, 266 Conn. 302. Finally, and as previously discussed, in order for evidence to be relevant, it "need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [See] Conn. Code Evid. § 4-1 (defining relevant evidence as evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence)." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 267 Conn. 611, 635, 841 A.2d 181 (2004).

We conclude that the trial court did not abuse its discretion by refusing to strike Milzoff's testimony. First, Milzoff's testimony was relevant, at the very least, as the trial court suggested, to the charge of misconduct with a motor vehicle. See *State* v. *Ortiz*, 29 Conn. App. 825, 836, 618 A.2d 547 (1993) (risks associated with operating vehicle with elevated blood alcohol content may constitute criminal negligence under § 53a-57). Milzoff's testimony indicating that alcohol inhibits one's reflexes, coupled with the evidence that the defendant was driving thirty miles per hour above the speed limit immediately before the crash, could have aided the jury

in concluding that the defendant's conduct constituted a gross deviation from the ordinary standard of care. See id., 836–37.

In addition, Milzoff's testimony that the effects of alcohol are dependent on how much an individual consumes was helpful to establish how much the defendant may have been effected. As previously discussed, the state was required to show that the defendant lacked, to an appreciable degree, the ability to function properly in relation to the operation of his motor vehicle. It cannot be said that Milzoff's testimony did not aid the jury in this regard.

We are not persuaded that, as the defendant suggests, Milzoff's testimony should have been excluded because it was not beyond the knowledge of an average layperson. The short answer to this contention is that, although some of Milzoff's testimony could be classified as common knowledge, some of his testimony was likely beyond the knowledge of the average juror, particularly his testimony regarding the *specific* effects of alcohol and how much alcohol constitutes a "dose."

By the same token, we are not persuaded by the defendant's reliance on *State* v. *McNally*, supra, 39 Conn. App. 425, for the proposition that Milzoff's testimony should have been stricken because it was " 'a superfluous attempt to put the gloss of expertise, like a bit of frosting, upon inferences which lay persons were equally capable of drawing from the evidence.' " *McNally* is distinguishable from the present case. First, the Appellate Court in *McNally* affirmed the trial court's ruling *to exclude* expert testimony. Simply because it was not an abuse of discretion for the trial court in that case to exclude expert testimony does not necessarily mean that it would have been an abuse of discretion if the court had allowed it. Second, the defendant in *McNally*, a police officer who observed the victim on

the evening in question, sought to give an *expert opinion* that the victim was intoxicated on the basis of his training as a police officer. Id. The Appellate Court concluded "a determination of a person's intoxication based *solely on observation and not on an interpretation of sobriety tests* is within the general knowledge of the jury." (Emphasis in original.) Id., 424. Thus, *McNally* merely stands for the proposition that, unless the witness can provide *something more* than merely his observation of a particular individual, expert testimony on the issue of intoxication ordinarily is not appropriate. In the present case, Milzoff expressly did not offer any opinion as to whether the defendant was intoxicated; rather, he testified only as to the typical effects of alcohol on the central nervous system on the basis of his background in toxicology.

Finally, we reject whatever claims the defendant makes regarding the trial court's failure to hold a hearing pursuant to *State* v. *Porter*, supra, 241 Conn. 57, before it received the testimony of Milzoff. Aside from the defendant's inadequate briefing of this contention, it suffices to say that a *Porter* hearing is not required for an expert to testify, in essence and in general terms, that alcohol affects one's central nervous system. See *Maher* v. *Quest Diagnostics, Inc.*, 269 Conn. 154, 169, 847 A.2d 978 (2004) ("[S]ome scientific principles have become so well established that [a threshold admissibility] analysis is not necessary for admission of evidence thereunder. . . . Evidence derived from such principles would clearly withstand [such an] analysis, and thus may be admitted simply on a showing of relevance." [Internal quotation marks omitted.]).

IV

## PROSECUTORIAL MISCONDUCT

Finally, the defendant claims that his conviction should be reversed because the state twice engaged in

prosecutorial misconduct. First, the defendant claims that, with respect to the testimony of Milzoff, it was improper for the state not to repeat its proffered hypothetical in front of the jury. See part III of this opinion. Second, the defendant claims that the state, in its closing arguments, improperly commented on the veracity of some of the defendant's witnesses. We reject these claims.

With respect to the hypothetical question that the state did not ask Milzoff in front of the jury, we can find nothing in the record to suggest that this constituted misconduct on the part of the prosecutor. The state specifically asked the trial court if it needed to repeat the proffered hypothetical to the jury, and the court indicated that, if the state chose not to repeat the hypothetical, the defendant's counsel could challenge the evidence. In addition, the trial court noted that it was the state's choice if it wished to present the evidence circumstantially rather than directly. Finally, the state indicated in the trial court that it did not ask the hypothetical because it was trying to avoid the issue of blood alcohol content.

Turning to the defendant's second claimed instance of prosecutorial misconduct, the prosecutor commented to the jury during closing arguments: "The judge is going to instruct you on credibility. You're going to have to judge the credibility of all the witnesses that came before you. *I submit to you* that the [defendant's friends from La Cucina that night] lied to you, and told you half the truth to help their friend. If they came in and said, we were with him and he appeared okay, but he was drinking scotch. That would make more sense. Not that he appeared okay and I don't know what he was drinking. I never saw him drink. Bull.[39] That doesn't make sense." (Emphasis added.)

---

[39] We note our strong disapproval of the prosecutor's use of the word " 'bull,' " which we previously criticized in *State* v. *Rizzo*, supra, 266 Conn. 259–60. "We would be socially and linguistically naive if we did not read

"We first set forth the principles that are common to all of the alleged improper comments on the credibility of witnesses. [A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 462, 832 A.2d 626 (2003). "[I]t is not improper [however] for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. *The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like.*" (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 465–66; see *State* v. *Stevenson*, 269 Conn. 563, 583–84, 849 A.2d 626 (2004).

---

th[is] [use] of the term 'bull' as a shorthand for the slang expletive 'bullshit,' and if we did not conclude that the jury likely heard [it] in the same sense." Id., 259. The defendant in the present case neither objected to this remark in the trial court, nor does he claim specifically that it was inappropriate on appeal; rather, the defendant simply asserts that the prosecutor's comments indirectly attacked the defendant's credibility. Because the defendant has not claimed otherwise, at trial or on appeal, we presume that the state's use of the term " 'bull' " did not materially affect the outcome of the trial. See *State* v. *Stevenson*, 269 Conn. 563, 575, 849 A.2d 626 (2004) ("[w]hen defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial" [internal quotation marks omitted]). Moreover, the prosecutor's isolated use of the term " 'bull' " in the present case pales in comparison to the repeated instances of misconduct in *State* v. *Rizzo*, supra, 255–64.

In the present case, the prosecutor explicitly told the jurors that it was their task to access credibility. The prosecutor then *submitted to the jury* that, on the basis of the evidence, the jury properly could infer that the witnesses were not credible. We cannot say that these remarks deprived the defendant of a fair trial.

The judgment is affirmed.

In this opinion NORCOTT, PALMER and VERTEFEU-ILLE, Js., concurred.

KATZ, J., dissenting. The majority concludes that, when a motion for judgment of acquittal is denied at the close of the state's case, and a defendant subsequently produces evidence in his own behalf, the defendant thereby waives appellate review of that denial. In other words, applying the so-called "waiver rule," the majority concludes that appellate review encompasses all of the evidence at trial, including the evidence presented by the defendant. Although I agree with the majority's conclusion that the waiver rule is constitutional, I cannot ignore the serious impact that the application of this rule will have on our system of criminal justice. In my view, the waiver rule places a criminal defendant on the horns of an unfair dilemma, forcing him to choose between two equally fundamental rights: the right to present a defense, and the right to have the state bear the burden of proving each and every element of a charged crime beyond a reasonable doubt. As this court previously has stated, "[i]t is doubtful whether a criminal defendant should be placed in such a dilemma." *State* v. *Rutan*, 194 Conn. 438, 441, 479 A.2d 1209 (1984). Accordingly, I believe that this court should exercise its supervisory authority over the administration of justice to reject the application of the waiver rule in criminal cases.

In *Rutan*, this court stated: "Under the waiver rule, when a motion for [judgment of] acquittal at the close

of the state's case is denied, a defendant may not secure appellate review of the trial court's ruling without [forgoing] the right to put on evidence in his or her own behalf. The defendant's sole remedy is to remain silent and, if convicted, to seek reversal of the conviction because of insufficiency of the state's evidence. If the defendant elects to introduce evidence, the appellate review encompasses the evidence in toto. The defendant then runs the risk that the testimony of defense witnesses will fill an evidentiary gap in the state's case. The waiver rule, therefore, forces the defendant to choose between waiving the right to [present] a defense and waiving the right to put the state to its proof." Id., 440–41. It was the recognition of this choice that prompted the court to question the wisdom of placing a criminal defendant in such a dilemma. Although *Rutan* did not present an opportunity to reject the waiver rule, the court indicated that, "in an appropriate case, we may well conclude that the denial of a defendant's motion for acquittal at the close of the state's case may be assignable as error on appeal from a conviction, whether or not the defendant has introduced evidence in his or her own behalf." Id., 444.

In so stating, the court in *Rutan* noted that "[o]ur previous cases [had] applied the waiver rule without any discussion of the rule's effect on the defendant's right to have the state prove his or her guilt beyond a reasonable doubt. . . . Our case law arose under former rules of practice which made no distinction between the motions for directed verdict in a civil trial and a criminal prosecution. In our courts, as in other jurisdictions, the waiver rule was imported from the civil to the criminal sphere along with the motion for directed verdict itself. . . . Our current rules of procedure, however, reflect a heightened awareness of the constitutional differences between civil and criminal fact finding under which the survival of the waiver

rule is doubtful." (Citations omitted.) Id., 441–42; see *Cephus* v. *United States*, 324 F.2d 893, 896–97 (D.C. Cir. 1963); comment, "The Motion for Acquittal: A Neglected Safeguard," 70 Yale L.J. 1151, 1151–52 (1961); W. Maltbie, Connecticut Appellate Procedure (2d Ed. 1957) § 212, pp. 262–63.

Practice Book § 42-40, which governs motions for judgment of acquittal in general, provides in relevant part: "Motions for a directed verdict of acquittal and for dismissal when used during the course of a trial are abolished. Motions for a judgment of acquittal shall be used in their place. After the close of the prosecution's case in chief or at the close of all the evidence, upon motion of the defendant or upon its own motion, the judicial authority shall order the entry of a judgment of acquittal as to any principal offense charged and as to any lesser included offense for which the evidence would not reasonably permit a finding of guilty. . . ." In other words, § 42-40 "permits the defendant to make a motion for judgment of acquittal and thus avoid presenting a defense if the state has not made out a prima facie case." *State* v. *Allen*, 205 Conn. 370, 378, 533 A.2d 559 (1987). As an additional safeguard, Practice Book § 42-41 provides in relevant part that, "[i]f the motion is made after the close of the prosecution's case in chief, the judicial authority *shall either grant or deny* the motion before calling upon the defendant to present the defendant's case in chief. . . ." (Emphasis added.) Therefore, unlike a motion for a directed verdict made after the close of the plaintiff's case in a civil trial; see Practice Book § 16-37;[1] when a motion for judgment of

---

[1] Practice Book § 16-37 provides in relevant part: "Whenever a motion for a directed verdict made at any time after the close of the plaintiff's case in chief is denied or for any reason is not granted, the judicial authority is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. The defendant may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. . . ."

acquittal is made at the close of the state's case in a criminal trial, the trial court cannot reserve its decision on that motion, but rather, must rule on that motion before proceeding with the defendant's case-in-chief. See Practice Book § 42-41.

Implicit in §§ 42-40 and 42-41 of the rules of practice is a recognition of the principle that "[a] criminal defendant has the right to put the state to its burden and need not defend until and unless the state has presented a prima facie case." *State* v. *Allen*, supra, 205 Conn. 376. Put another way, "the prosecution must introduce sufficient evidence to justify a conviction before the defendant may be required to respond." *State* v. *Rutan*, supra, 194 Conn. 442–43. "One of the greatest safeguards for the individual under our system of criminal justice is the requirement that the prosecution must establish a prima facie case by its own evidence before the defendant may be put to his defense. 'Ours is the accusatorial as opposed to the inquisitorial system. . . . Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skillful investigation.' " *Cephus* v. *United States*, supra, 324 F.2d 895, quoting *Watts* v. *Indiana*, 338 U.S. 49, 54, 69 S. Ct. 1347, 93 L. Ed. 1801 (1949); see also *State* v. *Rutan*, supra, 443.

The waiver rule, however, as applied in a criminal case, cuts against these well established principles by forcing the defendant to choose between presenting a defense, at the risk of aiding the state in its prosecution, and not presenting a defense, with the hope that the jury nonetheless will acquit him or that an appellate court will conclude that the state's evidence was insufficient to support a guilty verdict. As one court recently stated, the waiver rule "presents a defendant whose motion to dismiss has been erroneously denied with a

Hobson's choice:[2] resting and sacrificing the right to present a defense out of fear that his or her testimony may cure defects in the prosecution's case, or putting on such evidence and thereby possibly assisting the prosecution in proving its case. This choice in essence compels a defendant to aid in his own prosecution and lessens the prosecutor's burden to prove each and every element of the case beyond a reasonable doubt. It denies a defendant the protections of the statute governing motions to dismiss." *In re Anthony J.*, 117 Cal. App. 4th 718, 732, 11 Cal. Rptr. 3d 865 (2004).

Essentially, the waiver rule unduly restricts the right of an accused to have the prosecution prove a prima facie case before he is required to present a defense. "[T]he defendant's willingness to ask for acquittal on the [prosecution's] evidence is not a willingness to gamble on a prediction that the jury or appellate court will find that evidence insufficient. Moreover, there is danger that under the waiver rule prosecutions may be pursued with inadequate evidence in the hope that defendants will supply missing evidence." *Cephus* v. *United States*, supra, 324 F.2d 896.[3] In other words, the

---

[2] In passing, I note that this is an inaccurate use of the term "Hobson's choice." That term does not signify a situation in which either alternative may be unfavorable; rather, it represents an illusory choice that is, in fact, no choice at all. *State* v. *Messler*, 19 Conn. App. 432, 436 n.3, 562 A.2d 1138 (1989) ("We note that the defendant's use of the term 'Hobson's choice' as a synonym for a choice of evils is inaccurate. The term is derived from the practice of Thomas Hobson . . . an English liveryman, of requiring each customer to take the next available horse. Thus, in modern usage a Hobson's choice is '[a]n apparent freedom of choice with no real alternative.' American Heritage Dictionary of the English Language, New College Edition, [p.] 626. The defendant does not claim that he was required to take the next available horse, but that he had to choose between two nags."). Therefore, it is more appropriate to state that the defendant in the present case, Benjamin J. Perkins, was wedged between Scylla and Charybdis.

[3] In *Cephus* v. *United States*, supra, 324 F.2d 895–97, the United States Court of Appeals for the District of Columbia Circuit expressed, in dictum, its strong disapproval of the waiver rule. The court later applied the *Cephus* dictum as a holding in *Austin* v. *United States*, 382 F.2d 129, 138 and n.20 (D.C. Cir. 1967). In this regard, *Cephus* was at the forefront of what one

application of the waiver rule, on appeal, generates an effect on the underlying criminal trial that is patently unfair. See *State* v. *Allen*, supra, 205 Conn. 379 ("[a]lthough . . . an important function of a trial is a search for facts and truth . . . a trial must also be fair" [citation omitted; internal quotation marks omitted]).

The majority reasons that the rule "merely governs *the appellate review* of a criminal defendant's trial; it does not govern the trial itself." (Emphasis in original.) Although it is true that the waiver rule applies on appeal to determine the scope of evidence to be reviewed, this court has recognized that "[t]he trial of a criminal case, and the ensuing appeal from a judgment of conviction, are not separate and distinct proceedings divorced from one another. They are part of the continuum of the process of adjudication." (Internal quotation marks omitted.) *Bunkley* v. *Commissioner of Correction*, 222 Conn. 444, 459, 610 A.2d 598 (1992). Accordingly, a rule that is applied on appeal can have a definite effect on the underlying trial. See *Curry* v. *Burns*, 225 Conn. 782, 793, 626 A.2d 719 (1993) ("although the general verdict rule applies on appeal to preclude the consideration of certain claims, it has a definite effect on the trial"); see also *Ziman* v. *Whitley*, 110 Conn. 108, 114–15, 147 A. 370 (1929). The waiver rule requires a defendant's trial counsel to anticipate its application on appeal and, in the hurry of trial, decide whether to present a defense or remain silent. The result of this decision could have a substantial impact on either the jury's verdict, should

commentator has characterized as a "sharp attack" on the rule. See 2A C. Wright, Federal Practice and Procedure (3d Ed. 2000) § 463, p. 287. The Court of Appeals has since overruled its earlier decision in *Austin*, and has joined the other federal circuits in applying the waiver rule in criminal cases. See *United States* v. *Foster*, 783 F.2d 1082, 1085–86 (D.C. Cir. 1986) (en banc). Although I recognize that the principles enunciated in *Cephus* are no longer the law of that federal circuit, the discussion of those principles in *Cephus* persuades me that this court should reject the waiver rule in Connecticut.

the defendant decline to present a defense, or on appeal, should the defendant, in presenting a defense, unwittingly aid in his own prosecution.[4] This effect of the waiver rule, in my view, undermines both the integrity of the defendant Benjamin J. Perkins' trial, in the present case, and the perceived fairness of our judicial system as a whole.

Although, as I previously have stated herein, I agree with the majority that the waiver rule is constitutional, this determination does not end the analysis because, in my view, for all the reasons articulated in this dissenting opinion, the rule nevertheless places the criminal defendant in a dilemma that is of the utmost seriousness.[5] Therefore, in light of the rule's impact on the overall fairness of the proceedings, I would invoke this court's inherent supervisory authority over the administration of justice to reject the rule. "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that

[4] The majority notes that, when a motion for judgment of acquittal at the close of the state's case is granted, double jeopardy principles prevent the state from obtaining appellate review of that ruling. See *State* v. *Paolella*, 210 Conn. 110, 122, 554 A.2d 702 (1989). The majority therefore reasons that, "[i]n this regard, the failure to follow the waiver rule would give the defendant the best of both worlds: if his motion for a judgment of acquittal is granted, the trial has ended and the state cannot obtain review of the trial court's ruling; if his motion is denied, he would be able to secure appellate review of that denial, irrespective of the evidence that was ultimately submitted to the jury." See footnote 27 of the majority opinion. In essence, the majority reasons that, because double jeopardy principles protect a defendant from successive prosecution following a judgment of acquittal, he somehow should have less of a right to have the state meet its burden to establish a prima facie case against him before he is required to present a defense. I cannot agree with the majority's observation.

[5] Unlike the examples of other difficult choices that a defendant confronts in the course of a criminal trial to which the majority points, the dilemma the defendant faces because of the waiver rule occurs essentially as a result of trial court error in failing to grant his motion for judgment of acquittal at the close of the state's case.

will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . *State* v. *Valedon*, 261 Conn. 381, 386, 802 A.2d 836 (2002). [O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . *State* v. *Pouncey*, 241 Conn. 802, 812–13, 699 A.2d 901 (1997). Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. See *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998) ([o]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 61 n.26, 826 A.2d 1126 (2003).

In addition, "[u]nder our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process." (Citations omitted; internal quotation marks omitted.) *State* v. *Valedon*, supra, 261 Conn. 386. I see no reason why this court should not invoke its supervisory authority, in conjunction with its supervisory power over proceedings on appeal; see Practice Book § 60-2;[6] to adopt a rule of appellate procedure that will guide this court and the Appellate Court in the fair administration of criminal appeals. See *State* v. *Madera*, 198 Conn. 92, 102, 503 A.2d 136 (1985) (this

---

[6] Practice Book § 60-2 provides in relevant part: "The supervision and control of the proceedings on appeal shall be in the court having appellate jurisdiction from the time the appeal is filed, or earlier, if appropriate, and, except as otherwise provided in these rules, any motion the purpose of which is to complete or perfect the trial court record for presentation on appeal shall be made to the court in which the appeal is pending. The court may, on its own motion or upon motion of any party, modify or vacate any order made by the trial court, or a judge thereof, in relation to the prosecution of the appeal. . . ."

court has "general supervisory powers over appellate procedure"); *State* v. *Revelo*, 55 Conn. App. 217, 232, 740 A.2d 390 (1999) (*Shea, J.*, dissenting) (appellate courts possess "supervisory authority over proceedings on appeal 'to facilitate business and advance justice' "), rev'd in part, 256 Conn. 494, 775 A.2d 260, cert. denied, 534 U.S. 1052, 122 S. Ct. 639, 151 L. Ed. 2d 558 (2001).

Accordingly, I believe that this court should exercise its supervisory authority over the administration of justice, and join those jurisdictions that reject the waiver rule in criminal cases.[7]

---

[7] In addition, I note that even the jurisdictions that follow the waiver rule do not apply the rule in all cases. For example, some courts do not apply the waiver rule when the defendant has not presented evidence in his or her own behalf, but rather, merely has cross-examined or rebutted a codefendant's witnesses. See, e.g., *United States* v. *Belt*, 574 F.2d 1234, 1236 (5th Cir. 1978); *State* v. *Copes*, 244 Kan. 604, 610, 722 P.2d 742 (1989). In addition, at least one court has concluded that "a defendant who presents evidence on one count, but no evidence on another count, preserves his right to have the nonrebutted count reviewed based on the government's case alone." *United States* v. *Thomas*, 987 F.2d 697, 703 (11th Cir. 1993).

Moreover, in 1994, the Federal Rules of Criminal Procedure were amended to permit the trial court to reserve its ruling on a motion for judgment of acquittal made at the close of the prosecution's case. See Fed. R. Crim. P. 29 (b). If the trial court reserves its ruling, however, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Id. According to one commentator, the 1994 amendment, which added subsection (b) to rule 29, "put an end to the waiver doctrine for cases in which the court reserves but does not rule on the motion." 2A C. Wright, Federal Practice and Procedure (Sup. 2004) § 463, p. 35. Notably, prior to 1994, the federal rules were similar to our rules of practice, in that they did not permit the trial court to reserve its ruling on a motion for judgment of acquittal made at the close of the prosecution's case. Consequently, several federal courts refused to apply the waiver rule on appeal when the trial court improperly had reserved its ruling on such a motion. See, e.g., *United States* v. *Rhodes*, 631 F.2d 43, 44 (5th Cir. 1980) ("if the trial court erroneously defers ruling on the motion for acquittal and the defendant presents evidence, the appellate court in reviewing the sufficiency of the evidence will only consider the evidence presented in the Government's case-in-chief"); *United States* v. *House*, 551 F.2d 756, 760 (8th Cir.) ("the entire record should not be reviewed for evidence of guilt where the defendant has aggressively sought and was refused the trial judge's view of the sufficiency of the evidence"), cert. denied, 434 U.S. 850, 98 S. Ct. 161, 54 L. Ed. 2d 119 (1977).

As the majority correctly notes; see footnote 23 of the majority opinion; the federal courts and a majority of state jurisdictions apply the waiver rule in criminal cases. There are at least seven states, however, that do not apply the waiver rule in criminal cases. See, e.g., *Ex parte Hardley*, 766 So. 2d 154, 157–58 (Ala. 1999) ("[w]e must review the denial of [the defendant's] motion for a judgment of acquittal at the close of the State's case-in-chief by considering the state of the evidence as it existed at that stage of the trial"); *In re Anthony J.*, supra, 117 Cal. App. 4th 730 (concluding that "federal waiver rule . . . is not applicable in California"); *Cline* v. *State*, 720 A.2d 891, 892 n.6 (Del. 1998) (per curiam) ("The motion for acquittal must be tested solely on the State's case. The defendant's testimony in his case cannot be considered."); *State* v. *Pennington*, 534 So. 2d 393, 395–96 (Fla. 1988) (en banc) ("[t]he Florida rule expressly states that a defendant's motion for judgment of acquittal at the close of the state's case is not waived by the defendant's subsequent introduction of evidence"); *Commonwealth* v. *Platt*, 440 Mass. 396, 400–401, 798 N.E.2d 1005 (2003) ("The only issue raised by a motion for a required finding of not guilty is whether the Commonwealth presented sufficient evidence of the defendant's guilt to submit the case to the jury. . . . To make this determination, we look only to the evidence presented by the Commonwealth, and disregard any contrary evidence presented by the defendant." [Citations omitted; internal quotation marks omitted.]); *People* v. *Garcia*, 398 Mich. 250, 256, 247 N.W.2d 547 (1976) (appellate review of denial of motion for directed verdict of acquittal at close of prosecution's case limited to "evidence *presented by the prosecution*" [emphasis in original]); *State* v. *Reyes*, 50 N.J. 454, 459, 236 A.2d 385 (1967) (in reviewing denial of motion for judgment of acquittal made at conclusion of state's case, "no consideration may be given to any evidence or inferences from the defendant's case").

Because I would limit the scope of our review to the evidence presented by the state, I turn now to the sufficiency of that evidence. In so doing, I reiterate the standard of review that we apply to a claim of insufficient evidence. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Newsome*, 238 Conn. 588, 616, 682 A.2d 972 (1996).

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Id., 617.

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reason-

able and logical. . . . *State* v. *McMahon*, 257 Conn. 544, 566–67, 778 A.2d 847 (2001) [cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002)].

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty. . . . Id., 567." (Internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 377–79, 796 A.2d 1191 (2002).

In the present case, I would conclude that the evidence presented by the state was insufficient to establish that the defendant had been under the influence of an intoxicating liquor at the time of the motor vehicle accident that caused the death of the victim, Michael Novack. Accordingly, I would conclude that the trial court improperly denied the defendant's first motion for judgment of acquittal as to the count of manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b (a).[8]

The state presented Francis X. Grosner, who testified that, on November 20, 2000, he had worked as a bartender at the Tavern on Main in Westport from approximately 4:30 p.m. to 1:30 a.m. Grosner recalled seeing

---

[8] General Statutes § 53a-56b (a) provides: "A person is guilty of manslaughter in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he causes the death of another person as a consequence of the effect of such liquor or drug."

two men in the bar that night, and he testified that he believed that they had left the bar between 8 and 9 p.m. Grosner also testified that he had served two bottles of beer to one of the men. He could not, however, identify that man at the time of trial.

The defendant's friend, Jason Medvegy, testified that he had been with the defendant and the victim at La Cucina, a restaurant in Fairfield, from approximately 9:15 to 11 p.m. on November 20. Medvegy testified that the defendant was drinking scotch that night. He did not know, however, how much scotch the defendant had consumed that night. On cross-examination by defense counsel, Medvegy testified that the defendant had not appeared to be intoxicated.

Ralph Fidaleo, a bartender at La Cucina, testified that, between approximately 8:30 and 10:30 p.m., he had served three glasses of scotch to "a G.Q. looking guy." According to Fidaleo, each glass contained about two ounces of scotch. Although Fidaleo described the customer as "a very clean cut, good lookin[g] guy" in his early thirties, he could not identify the defendant as that person at the time of trial. Further, on cross-examination by defense counsel, Fidaleo stated that the man had not appeared to be intoxicated. Fidaleo also admitted that the night had been "fairly busy" for the restaurant, and that he had been the only bartender servicing a crowd of twelve to fifteen people.

The state also presented the defendant's boss, Steven Habetz, who testified that the defendant had made five telephone calls to his cell phone between 12 a.m. and 12:30 a.m. on November 21, 2000, after the accident. Habetz explained that, through these telephone calls, he had been able to determine the defendant's location. Habetz testified that when he picked up the defendant, he noted that the defendant "looked like he had been in a brawl. He was bleeding from the head . . . and

looked dirty." On cross-examination by defense counsel, Habetz testified that the defendant had appeared "very upset," but had not appeared intoxicated. Indeed, Habetz stated that he had not smelled any alcohol on the defendant, and that the defendant had seemed "very lucid." Habetz testified that he had brought the defendant back to his own house because he believed that the defendant needed to consult with an attorney, "[a]nd it was my intention to get him an attorney."

Finally, the state presented Joel Milzoff, a toxicologist with the department of public safety, who testified generally to the effects of alcohol. Milzoff testified that alcohol depresses functions of the nervous system, thereby inhibiting the reflexes and muscle control that are "essential for operating a motor vehicle." Milzoff further testified that one dose of alcohol is equivalent to one twelve ounce beer, or one single ounce of scotch, and that even one dose of alcohol could depress the nervous system "[t]o a slight degree . . . ." According to Milzoff, this effect increases as the person consumes more alcohol.

Viewing this evidence as a whole and drawing all inferences in favor of supporting the jury's verdict, I cannot conclude that it establishes, beyond a reasonable doubt, that the defendant had been under the influence of intoxicating liquor at the time of the accident. Although Grosner and Fidaleo both testified that they had served alcohol to a man generally matching the defendant's description on the night of November 20, 2000, neither witness was able to identify the defendant at trial. In addition, Fidaleo testified that the man he had served the scotch to had not appeared intoxicated. Medvegy, who had been with the defendant at La Cucina for approximately two hours, could not testify as to how much alcohol the defendant had consumed that night. Moreover, both Medvegy and Habetz testified that the defendant had not appeared intoxicated. Finally, although Milzoff testified about the effects of alcohol,

in general, he did not provide an expert opinion concerning whether *the defendant* had been intoxicated on the night of the accident. Therefore, I would conclude that the trial court improperly denied the defendant's first motion for judgment of acquittal on the charge of manslaughter in the second degree with a motor vehicle, because the state failed to present sufficient evidence to support a prima facie case on that charge.[9]

Accordingly, I respectfully dissent.

[9] I nonetheless would conclude that the state's evidence was sufficient to support the defendant's conviction of misconduct with a motor vehicle in violation of General Statutes § 53a-57 (a), which provides: "A person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person." General Statutes § 53a-3 (14) defines criminal negligence in relevant part as "a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ." In addition, "[c]onsumption of alcohol, whether to the point of influence or intoxication, is not required to prove a violation of § 53a-57 . . . ." *State* v. *Ortiz*, 29 Conn. App. 825, 834 n.5, 618 A.2d 547 (1993).

Through the expert testimony of David Kassay, a sergeant with the Westport police department, the state presented the following evidence. The accident had occurred on a section of Wilton Road that is a two lane roadway with winding curves and rolling hills. The roadway was "damp" on the night of the accident. The posted speed limit of that section of Wilton Road was twenty-five miles per hour. At the time of the accident, the defendant's vehicle had been traveling at a speed of at least forty-seven miles per hour. Kassay concluded, on the basis of several methods of accident reconstruction, that "[e]xcessive speed" was a contributing factor in the collision. In addition, although I believe that the state's evidence was insufficient to establish that the defendant had been under the influence of an intoxicating liquor, the state nonetheless presented sufficient evidence, through the testimony of Medvegy, that the defendant had been drinking scotch less than three hours before the accident occurred.

On the basis of the cumulative effect of this evidence and all the inferences reasonably drawn therefrom, the jury reasonably could have concluded, beyond a reasonable doubt, that the defendant had been criminally negligent in driving at a speed of approximately double the posted speed limit, late at night, on a damp, two lane roadway with winding curves and rolling hills, less than three hours after having consumed alcohol. See *State* v. *Ortiz*, supra, 29 Conn. App. 836–37; *State* v. *Dawson*, 23 Conn. App. 720, 723–24, 583 A.2d 1326 (1991). The jury also reasonably could have concluded that the defendant's criminal negligence had caused the collision which, in turn,

had caused the victim's death. Therefore, I would conclude that the state presented sufficient evidence to support the conviction of misconduct with a motor vehicle and, accordingly, the trial court properly denied the defendant's motion for judgment of acquittal as to that count.